UNITED STATES of America,
Plaintiff–Appellee,

v.

Artemio Ramirez LOPEZ and Francisco
Chaidez, Defendants–Appellants.

Nos. 92–3521, 92–3522.

United States Court of Appeals,
Seventh Circuit.

Argued May 14, 1993.

Decided Oct. 12, 1993.

Mel S. Johnson, Asst. U.S. Atty. (argued), Penelope C. Fleming, Office of the U.S. Atty., Milwaukee, WI, for U.S.

Robert J. Penegor, Carl W. Chesshir, David J. Lang, Brookfield, WI, for Artemio Ramirez Lopez.

Dennis P. Coffey (argued), Coffey, Coffey & Geraghty, Milwaukee, WI, for Francisco Chaidez.

Before BAUER, EASTERBROOK, and ROVNER, Circuit Judges.

BAUER, Circuit Judge.

Artemio Ramirez Lopez and Francisco Chaidez appeal their convictions for violations of federal narcotics statutes. Ramirez was convicted of knowingly and intentionally distributing approximately ten kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). Chaidez was convicted of conspiracy to possess with the intent to distribute cocaine, distribution of cocaine, possession with the intent to distribute cocaine, and the use of a firearm in relation to drug trafficking in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 924(c) respectively. We affirm.

## I. Facts

This case involves a series of cocaine transactions among Ramirez, Chaidez, Carmen Fontanez, Cristobal Santiago, and Kevin Carr, a Milwaukee County, Wisconsin Deputy Sheriff. All the transactions occurred in or near Milwaukee, Wisconsin. Carr posed as a cocaine dealer and usually worked directly with Fontanez or Santiago to arrange sales of cocaine. Carr typically paid Fontanez or Santiago who then dealt with Chaidez and Ramirez. The first relevant transaction occurred on July 2, 1991. On that day, Carr picked up Santiago and, pursuant to Carr's directions, drove him to the corner of Eleventh and National where they would purchase cocaine.[1] After arriving and waiting at Eleventh and National, a blue Chevrolet Corsica registered to Chaidez appeared. Santiago tried unsuccessfully to arrange a sale and told Carr that they would have to make the deal at Twelfth and Maple. Carr drove Santiago to the new site and, again, the blue Corsica appeared. Chaidez was driving and Fontanez was a passenger. Carr gave Santiago $2400 cash to buy cocaine. Fontanez and Santiago left their respective cars and met to discuss the deal. The two of them walked down the street and, a short time later, Santiago returned with two ounces of cocaine and handed the cocaine over to Carr.

Next, on July 22, 1991, Carr set up a transaction with Santiago and, as scheduled, the two of them arrived at Eleventh and National. After a considerable wait, Carr was invited to an apartment above a nearby restaurant to buy cocaine. Carr accepted the invitation. Fontanez had received Carr's order for a half kilogram of cocaine and called Chaidez. Chaidez agreed to supply the cocaine. Chaidez sent an unidentified man to give Fontanez the cocaine. Fontanez sold Carr the cocaine for $16,000. Santiago and Fontanez kept two thousand dollars for themselves and delivered the remaining $14,000 to the unidentified man.

On September 19, 1991, Carr and Fontanez teamed up again. Carr arranged to meet Fontanez at Sixteenth and National. Carr arrived as scheduled and met Fontanez. She did not have the cocaine. Instead, she made a series of phone calls to Chaidez from different locations. Carr and Fontanez eventually went to Fifth and Maple and met Chaidez, who was driving his blue Corsica. Fontanez retrieved a bag that contained a half kilogram of cocaine from Chaidez's car. Fontanez gave the bag to Carr in exchange for $14,500 cash. Fontanez kept $500 for herself and gave $14,000 to Chaidez.

Carr set up his next purchase through phone conversations with Fontanez. On November 13, 1991, Carr met Fontanez at Fifth

---

1. The street names referred to in the facts are streets in Milwaukee, Wisconsin.

and Maple. Chaidez showed up in his blue Corsica, picked up Fontanez, drove around the block, and dropped Fontanez off. Fontanez then got into Carr's vehicle with the cocaine and sold it to him for $22,400. After the sale, Chaidez sent Ramirez in Chaidez's car to pick up the money.

On January 9, 1992, law enforcement officers tapped Chaidez's phone and overheard Chaidez tell someone that he had to get a suitcase out of his residence. FBI and DEA agents monitored Chaidez's residence. They observed two people leave the Chaidez residence with a brown suitcase, put the suitcase in a car, and drive off. The agents stopped the vehicle a few blocks away and discovered that the suitcase contained 738.7 grams of cocaine and an O'Haus triple-beam scale.

The final episode took place on January 17, 1992. On that day, Ramirez drove Chaidez and Fontanez to a bar. Fontanez called Carr to set up the sale of ten kilograms of cocaine. Meanwhile, Chaidez and Ramirez drove to another location where Ramirez retrieved a blue plastic laundry basket and put it in the car. Ramirez and Chaidez then picked up Fontanez and went to a location on the shore of Lake Michigan where Fontanez had arranged to meet Carr. On the drive there, the three of them joked about the weather and the cocaine that was in the basket.

When they arrived at the lakefront, Ramirez and Chaidez left the Corsica and looked around until they spotted Carr's vehicle. They returned to their vehicle and drove to Carr's vehicle. Chaidez left his car, carried the blue plastic laundry basket with him, and entered Carr's vehicle. The basket contained ten kilograms of cocaine, which Chaidez showed Carr. A few moments later, law enforcement officers swept into the area and arrested Fontanez, Chaidez, and Ramirez. Chaidez was carrying a mobile phone, a loaded handgun, and $980 in cash when he was arrested.

After the arrest, Chaidez told police that he thought all along that Carr was a police officer. Demonstrating rather odd reason-

ing, Chaidez stated that he continued to sell cocaine to Carr anyway because he wanted money. Chaidez also admitted his guilt to Carr. Later that day, a search of Ramirez's residence, made with his wife's consent, produced a loaded handgun and a small scale that was covered with cocaine residue. Ramirez and his wife both testified that the gun and the scale were his, not his wife's. The FBI searched Chaidez's residence and found more than one-quarter kilogram of cocaine.

Ramirez and Lopez were tried together before a jury. The jury acquitted Ramirez of conspiring to distribute cocaine, but found him guilty of knowingly and intentionally distributing approximately ten kilograms of cocaine on January 17, 1992. Chaidez was found guilty of conspiracy to possess with the intent to distribute cocaine, distribution of cocaine, possession with the intent to distribute cocaine, and the use of a firearm in relation to drug trafficking.[2] Ramirez was sentenced to a prison term of 121 months and fined $2,500. Chaidez was sentenced to 181 months and also fined $2,500. Both appeal their convictions.

## II. Discussion

### A. Challenges Raised by Ramirez

#### 1. The District Court's Denial of Ramirez's Motion for Severance

Prior to trial, Ramirez asked the district court to grant him a separate trial. The court denied his request. Ramirez argues that the court's decision amounts to reversible error for two reasons. First, he claims that his trial with Chaidez precluded him from calling Chaidez as a witness. At trial, Chaidez invoked his Fifth Amendment right against self-incrimination and refused to testify. Ramirez contends that Chaidez would have testified to exculpate him (Ramirez) at a separate trial. Second, Ramirez asserts that the evidence of criminal wrongdoing against his co-defendant Chaidez unduly prejudiced the jury against him (Ramirez). We find neither argument persuasive.

---

**2.** Santiago and Fontanez pleaded guilty. Two other defendants were tried with Ramirez and Chaidez and were acquitted.

■ We begin with the presumption that co-defendants who are indicted together are normally tried together. *United States v. Smith,* 995 F.2d 662, 670 (7th Cir.1993); *United States v. Atterson,* 926 F.2d 649, 657 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991). Rule 14 of the Federal Rules of Criminal Procedure authorizes the district court to grant a severance if it appears to the district court that a criminal defendant or the government will be unduly prejudiced by joinder of co-defendants for trial together.[3] *United States v. Schweihs,* 971 F.2d 1302, 1320 (7th Cir.1992). Criminal defendants who claim that a district court abused its discretion by denying a severance motion bear a heavy burden on appeal. *Id.* at 1321. We will reverse a district court's decision to deny severance only when the court's decision results in actual prejudice to the party appealing its decision. *Smith,* 995 F.2d at 670. To show actual prejudice, a defendant must demonstrate that he or she was unable to obtain a fair trial without severance, not just that a separate trial would have offered a better chance for acquittal. *Atterson,* 926 F.2d at 658.

■ The district court in this case conducted a hearing· to consider Ramirez's motion for severance. As to Ramirez's first argument for severance—the possibility that Chaidez would testify at a separate trial to exculpate Ramirez—the district court commented, quite correctly, that "even if the court were to grant a severance as to Mr. Ramirez, Mr. Chaidez still may exercise his Fifth Amendment right and not testify against Mr. Ramirez if Mr. Ramirez were tried separately." Transcript of Motion for Severance at 5. Ramirez's motion for severance included an affidavit from Ramirez's attorney which told the court "[t]hat affiant has been informed by Francisco Chaidez' counsel that Chaidez would be available to testify in a separate trial for and on behalf of Artemio Ramirez ·after his ·case has been disposed of and he is no .longer subject to jeopardy." Ex. A to Record in No. 92–3521 Doc. 21.

■ This clearly is not· sufficient to require a district court to grant a severance. When a criminal defendant seeks a severance in order to obtain exculpatory testimony a co-defendant would offer, the district court must consider three factors: (1) whether the co-defendant's testimony would in fact be exculpatory; (2) whether the co-defendant would in fact testify; and (3) whether the testimony would bear on defendant's case. *United States v. Tolliver,* 937 F.2d 1183 (7th Cir.), *cert. denied,* —— U.S.· ——, ——, 112 S.Ct. 329, 614, 116 L.Ed.2d 269 (1991); *Atterson,* 926 F.2d at 657–58.

Ramirez fails to satisfy the second part of this three-part ·test. We point out, as the district court did, that Chaidez himself did not submit an affidavit. Ramirez merely offered the unsupported statement of his attorney that his attorney had "been informed" that Chaidez would testify. At most, Ramirez presented only a possibility that Chaidez would testify to exculpate him at a separate trial. That is not enough to require severance. *See United States v. Studley,* 892 F.2d 518, 525 (7th Cir.1989) (mere possibility of a co-defendant's exculpatory testimony insufficient for severance). We held in *Studley* that the district court did not abuse its discretion when it denied appellant's motion for severance. *Id.* The only difference in this case is the assertion by Ramirez's lawyer that Chaidez would .testify once he "is no longer subject to jeopardy." If Chaidez himself had said this, we might have reason to pause. But Chaidez did not so state and the lack of any affidavit from Chaidez stands as a glaring omission in the record. Like the district court, we are not persuaded that Chaidez would testify.

3. Rule 14· states:
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial. Fed.R.Crim.P. 14.

The district court also properly rejected Ramirez's second argument—that evidence of criminal wrongdoing by Chaidez unduly prejudiced the jury against Ramirez. To succeed on this claim, a criminal defendant must rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow instructions from the court to consider each defendant separately. *Smith*, 995 F.2d at 671; *United States v. Goines*, 988 F.2d 750, 781 (7th Cir.1993). Mere speculation of "spill over guilt" is not enough to rebut these twin presumptions. *United States v. Doerr*, 886 F.2d 944, 972 (7th Cir.1989).

We begin, then, by examining the jury instructions. The district court instructed the jury that

> [a]lthough the defendants are being tried jointly, you must give separate consideration to each defendant. In so doing, you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his or her case decided on the evidence and the law applicable to him or her.

Record in No. 92–3522 Doc. 36 at 4. The instruction on this point was entirely proper, but, equally significant are the verdicts the jury returned. The jury, as we have noted, acquitted two of the four defendants. *See supra* note 2. It also found Ramirez guilty of distributing cocaine, found him innocent of conspiring to distribute cocaine, and found Chaidez guilty on all counts. The verdicts illustrate that the jury contemplated each count of the indictment and each defendant separately. *See Goines*, 988 F.2d at 781 (where jury acquitted one defendant of all charges, acquitted some defendants of a particular count, and convicted others, verdict "proved" that jury contemplated each count and each defendant separately). We conclude, therefore, that the district court did not abuse its discretion when it denied Ramirez's motion for severance.

### 2. Sufficiency of the Evidence

Ramirez's second argument is that the evidence is not sufficient to sustain his conviction for knowingly and intentionally distributing cocaine. Like his first argument, Ramirez faces an uphill battle. We will reverse Ramirez's conviction only if Ramirez persuades us that the record contains no evidence, regardless of how it is weighed, from which the jury could find him guilty beyond a reasonable doubt. *United States v. Easley*, 994 F.2d 1241, 1247 (7th Cir.1993). We review the evidence in the light most favorable to the government and we defer to the reasonable inferences drawn by the jury from the evidence. *Id.*

The evidence, mostly in the form of testimony by Carr and Fontanez, indicated that, on January 17, 1992, Ramirez and Chaidez drove Fontanez to a bar, then proceeded to another location where Ramirez carried a blue plastic laundry basket to Chaidez's blue Corsica. The blue plastic laundry basket contained cocaine. After picking up the laundry basket, Fontanez, Ramirez, and Chaidez proceeded to their rendezvous point. Ramirez, Chaidez, and Fontanez were arrested shortly thereafter. Additionally, other evidence showed that Ramirez possessed a loaded handgun and a small scale, items typically associated with the drug trade. This evidence sufficiently supports the jury's finding that Ramirez knowingly and intentionally distributed cocaine on January 17, 1992.

### B. Challenges Raised by Chaidez

#### 1. The Right to be Tried on the Basis of the Indictment Returned by the Grand Jury

Chaidez's first claim is that the district court allowed the government to expand the scope of the conspiracy charged in the indictment by putting forth evidence of co-conspirators and events not alleged in the indictment. Chaidez complains about two pieces of evidence that he says effectively amended the indictment. He points first to testimony by Fontanez that concerned events that occurred seven months prior to the date charged in the indictment. This testimony discussed the origins of Fontanez's involvement in the drug distribution ring. She explained that she had been injured in an automobile accident and that, due to financial

problems, she considered selling drugs to Santiago during December 1990 or January 1991. The indictment listed the conspiracy as beginning on June 1, 1991 and continuing until January 17, 1992.

Second, Chaidez alleges that the district court erroneously admitted evidence which related to Senovio Rodriguez. Chaidez charges that Fontanez's testimony described Rodriguez as a co-conspirator even though the indictment did not name Rodriguez. Chaidez claims that the district court erred when it instructed the jury that any defendant, including Chaidez, could be found guilty if he or she "participated in a conspiracy as charged with at least one other person, whether a defendant or not, and whether named in the indictment or not." Record in No. 92–3522 Doc. 36 at 18. Count one of the indictment, on the other hand, named only Chaidez, Ramirez, Fontanez, and Santiago and charged that they conspired "with each other" to distribute cocaine. Record in No. 92–3522 Doc. 13.

■ Chaidez raised his claim that the district court amended the indictment for the first time on appeal. Because he did not raise this issue before the district court, it is waived unless it was plain error.[4] We will reverse a conviction for plain error in the jury instructions only when a miscarriage of justice would otherwise result. *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). A miscarriage of justice occurs when the plain error is such that it could result in the conviction of an innocent person or the imposition of an erroneous sentence. *United States v. Caputo,* 978 F.2d 972, 974 (7th Cir.1992).

■ First, the testimony of events that occurred seven months prior to the date the indictment charges for the commencement of the conspiracy merely provided background information about Fontanez's involvement in the drug ring. Chaidez claims that this background testimony violated his right to be tried only on charges returned by a grand jury because it expanded the scope of the indictment to events that occurred seven months prior to those charged. *See United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985) (discussing the right to be tried on charges returned by a grand jury). Fontanez's testimony, admitted as background information, did not refer to or mention Chaidez. We find no basis for his claim that it could have prejudiced him. *See United States v. Goodapple,* 958 F.2d 1402, 1407 (7th Cir.1992) (evidence of transaction five years prior to those charged in indictment properly admitted). Her testimony in this regard certainly did not amend the indictment with respect to Chaidez.

Chaidez's second complaint is that the district court effectively amended the indictment when it instructed the jury that Chaidez could be guilty of criminal conspiracy if the jury found that he conspired with a co-conspirator who was not named in the indictment. He claims that the admission of the testimony about Rodriguez, coupled with the jury instructions, told the jury that he could be guilty for conspiring with Rodriguez even though the conspiracy count of the indictment charged that the named co-conspirators conspired only "with each other."

■ The instructions given by the district court to the jury explained that Chaidez was "not on trial for any act or conduct not alleged in the indictment."[5] Record in No. 92–3522 Doc. 36 at 4. The problem, as Chaidez accurately points out, is that the district court explained that the indictment charged a "conspiracy among the defendants named in count one," but then added the following: "A person cannot conspire with himself, and therefore you cannot find a defendant guilty unless you find beyond a reasonable doubt that he participated in a conspiracy as charged with at least one other person,

---

**4.** Rule 52(b) of the Federal Rules of Criminal Procedure establishes the plain error standard. That rule provides:
 **(b) Plain Error.** Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Fed.R.Crim.P. 52(b).

**5.** We note that the jury instructions contained the indictment and were available to the jury during its deliberations.

whether a defendant or not, and whether named in the indictment or not." *Id.* at 18. Chaidez contends that this instruction amended count one of the indictment and, coupled with the testimony about Rodriguez, enabled the jury to find him guilty of conspiring with someone (Rodriguez) who was not named in count one.

■ Normally, a criminal defendant can be convicted of conspiring with anyone. The defendant's co-conspirator does not have to be named in the indictment. *United States v. Lechuga,* 994 F.2d 346, 350 (7th Cir.1993). Additionally, a co-conspirator's identity need not be known. *Rogers v. United States,* 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951); *United States v. Winn,* 948 F.2d 145, 157 (5th Cir.1991). The government does not have to prove with whom the defendant conspired, but only that the defendant joined the alleged agreement. *United States v. Maholias,* 985 F.2d 869, 874 (7th Cir.1993).

The peculiar thing about this case is that the indictment charges an agreement only with those named, that is, "with each other," whereas the district court instructed the jury to return a guilty verdict if Chaidez (or any other defendant) conspired with anyone whether named or not. The evidence was abundant that Chaidez conspired with the named co-conspirators. Further, the district court instructed the jury, first and foremost, that the defendants were "not on trial for

any act or conduct not alleged in the indictment." Record in No. 92–3522 Doc. 36 at 4. The district court's error did not result in a miscarriage of justice. Therefore, even if the portion of the instruction Chaidez complains of was error, we do not believe it was plain error.

### 2. Jencks Act

Chaidez next claims that the district court violated the Jencks Act, 18 U.S.C. § 3500, when it did not conduct an *in camera* review of the government's notes taken during two pre-trial debriefings of Fontanez.[6] The relevant notes were allegedly taken by the government on February 7, 1992 and February 27, 1992 when the government interviewed Fontanez. Chaidez avers that Fontanez's responses to cross-examination at trial prompted his request for production of the original notes.

■ The Jencks Act compels the government's production of statements a government witness has signed or otherwise adopted or approved and which relate to the subject matter of a witness's testimony. *United States v. Morris,* 957 F.2d 1391, 1400 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 380, 121 L.Ed.2d 290 (1992). Upon reasonable argument from counsel, a presumption arises that the district court should conduct an *in camera* inspection of documents to determine whether the documents

---

6. The Jencks Act provides in pertinent part:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court *in camera.*

\* \* \* \* \* \*

(c) The term "statement", as used in subsections (b), (c), and (d) of this section in relation

to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500.

are producible under the Jencks Act. *United States v. Marshall*, 985 F.2d 901, 907 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). That presumption can be overcome by an articulation on the record as to why an examination of the document was unnecessary or pragmatically impossible. *United States v. Allen*, 798 F.2d 985, 995 (7th Cir.1986).

 Here, the district court did not conduct an *in camera* inspection of the notes. First, the court ruled that, as a general matter, an agent's notes are not typically statements for purposes of the Jencks Act. *See, e.g., United States v. Herrero*, 893 F.2d 1512, 1524 (7th Cir.) (no need for *in camera* inspection when extrinsic evidence showed agent's notes did not fall within the definition of Jencks Act statements). Second, the court noted that Fontanez never signed or adopted the notes as her statement. The court also pointed out that the government gave defense counsel a memorandum of the interviews. We find the district court's reasons for not inspecting the notes unpersuasive and conclude that the district court erred when it did not conduct an inspection.

We considered the same issue in *Marshall*. In that case, as here, the defendants argued that the district court should have ordered the production of an agent's witness interview notes pursuant to the Jencks Act. *Marshall*, 985 F.2d at 907. We concluded that the district court erred by failing to conduct an *in camera* inspection of the notes to determine whether they were producible under the Jencks Act. *Id.* at 908. We held, however, that the error was harmless because it was "extremely unlikely that this error would either influence the jury or have more than a slight effect on the trial." *Id.* We therefore affirmed the defendant's conviction. *Id.*

 *Marshall* requires that we affirm Chaidez's conspiracy conviction on this point. As in *Marshall*, it is extremely unlikely that the district court's failure to conduct an *in camera* inspection of the notes in this case either influenced the jury or had more than a slight effect on the trial. *See also United States v. Brumel–Alvarez*, 991 F.2d 1452, 1457 (9th Cir.1992) (conviction affirmed if

Jencks error more than likely harmless). Chaidez has failed to make any claim that he was harmed by the district court's omission and has not alleged that there was any variance between Fontanez's pre-trial statements to the agents and her testimony at trial. The evidence against Chaidez was voluminous and we simply do not believe that the district court's failure to conduct an *in camera* inspection of the notes deprived Chaidez of any substantial right. Although we agree with Chaidez that the district court's failure to inspect the notes was error, we decide that such error was harmless. *See* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

3. The District Court's Failure to Instruct the Jury on Chaidez's Proposed Theory of Defense

 Chaidez finally contends the district court committed reversible error when it failed to instruct the jury on his proposed theory of defense to the conspiracy charge. Chaidez's theory of defense was that the evidence proved only the existence of a buyer-seller relationship, not a conspiracy. Record in No. 92–3522 Doc. 32.

The principal problem with Chaidez's claim is that the district court included Chaidez's theory of defense in the jury instructions. In relevant part, the district court instructed the jury as follows:

[I]t is defendant Francisco Chaidez's theory of defense that any relationship established by the evidence in this case is only that of a buyer-seller rather than a conspiracy. Evidence of a mere buyer-seller relationship without more is insufficient to support a finding of guilt on the charge of conspiracy to distribute cocaine. However, if you find that the alleged co-conspirators had a mutual understanding—an agreement to agree—to facilitate the achievement of a common goal, namely the continued unlawful distribution of cocaine, you may conclude that a conspiracy existed.

Record in No. 92–3522 Doc. 36 at 20. Chaidez complains that the "agreement to agree"

**1290**

language and the reference to "the continued unlawful distribution of cocaine" misstates the law. Chaidez relies on our decision in *United States v. Townsend,* 924 F.2d 1385 (7th Cir.1991) as support for his challenge to the jury instruction. His reliance is misplaced. Like the district court in this case, we noted in *Townsend* that conspiracies are really "agreements to agree" and involve agreements to commit crime, such as obtaining drugs for distribution. *Id.* at 1394. *See also Lechuga,* 994 F.2d at 346 (criminal conspiracy is an agreement to commit a crime).

Looking at the instructions as a whole we find no error in the district court's instruction on the conspiracy charge.

### III.

The convictions of Artemio Ramirez Lopez and Francisco Chaidez are

AFFIRMED.