670 A.2d 535

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
ALEX SANCHEZ, DEFENDANT–RESPONDENT.

Argued October 10, 1995—Decided February 5, 1996.

*Janet Flanagan,* Deputy Attorney General, argued the cause for appellant (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

*Frank Joseph Pugliese,* Assistant Deputy Public Defender, argued the cause for respondent (*Susan L. Reisner,* Public Defender, attorney).

The opinion of the Court was delivered by

STEIN, J.

Alex Sanchez (Alex) and his brother, Juan Sanchez (Juan), were jointly indicted for second-degree robbery and related offenses. On the eve of their joint trial, Alex moved for severance, claiming that Juan would provide testimony exculpating Alex if the two were tried separately. The trial court denied the motion, and both Alex and Juan were convicted of all charged offenses. The Appellate Division reversed, holding that severance was warranted because there was a substantial likelihood that Juan would have offered exculpatory testimony for Alex if they had been separately tried. We granted certification, 140 *N.J.* 276, 658 *A.*2d 300 (1995), to determine the standard by which trial courts should evaluate motions for severance based on the claim that one codefendant will exculpate another if the two are not tried together. We reverse.

I

On January 23, 1988, Mary Ann Wyman went shopping at the Monmouth Mall in Eatontown, New Jersey, along with her husband, daughter, and two grandchildren. At approximately 4:45 p.m., after Mrs. Wyman exited the mall and walked into the parking lot, a man grabbed her pocketbook and attempted to pry it away from her. Although Mrs. Wyman initially held on to the pocketbook, the assailant successfully wrestled it away on his second attempt. The force of the assailant's efforts caused Mrs. Wyman to fall to the ground and fracture her pelvis. She remained hospitalized for five days and was unable to return to work for nineteen weeks.

Mrs. Wyman's husband, Kenneth, had been walking approximately ten feet in front of his wife at the time of the attack. Hearing a scream, he turned around and saw his wife lying on the ground. He then watched the assailant run to and enter a station wagon parked alongside the curb near a mall entrance. Mr. Wyman recognized the assailant as the same man he had earlier noticed standing next to the open passenger door of the station wagon. Mr. Wyman did not see the driver of the station wagon as the car sped away, but he took note of the car's license plate number, CDE–82B. Mr. Wyman subsequently identified Juan at a photographic lineup as the person who had stolen his wife's pocketbook.

The Wymans' daughter, Laura Anselmo, was walking next to her mother at the time of the attack. At a photographic lineup and in court, she identified Juan as her mother's assailant.

Deborah Polito, who worked as a hairdresser at the mall, also observed the robbery. She was warming up her car in the parking lot, preparing to return home from work, when she saw a man take Mrs. Wyman's pocketbook, knock her to the ground, and enter his get-away car. Although Polito was not able to see the face of the assailant because of the speed of the attack, she had previously observed for approximately ten minutes the driver of the get-away car illegally parked in the fire zone abutting the mall. At a photographic lineup and in court, Polito identified Alex as the driver of the vehicle.

The screech of the get-away car caught the attention of Joseph Holsey, a shopper who was leaving the mall at the time of the robbery. He watched Mrs. Wyman fall to the ground, and then realized that the get-away car was approaching him. Fearing that the car would hit him, Holsey jumped back from the road to the sidewalk. From approximately four feet away, he saw two men through the windshield of the car. At a photographic lineup and in court, Holsey identified Alex as the driver of the vehicle and Juan as his passenger.

The brothers were jointly indicted in March 1988 for second-degree robbery, contrary to *N.J.S.A.* 2C:15–1; second-degree aggravated assault, contrary to *N.J.S.A.* 2C:12–1b(1); and third-degree theft, contrary to *N.J.S.A.* 2C:20–3.

On Monday, December 7, 1992, the day the joint trial was scheduled to begin, Alex moved for severance. The basis for the motion was an affidavit signed by Juan on July 6, 1988, in which Juan admitted that he robbed Mrs. Wyman with Noel Manuel, the person to whom the station wagon bearing license plate number CDE–82B was registered. Juan stated in the affidavit:

> How my brother Alex became implicated in this crime I['ll] never understand, because he had no knowledge of Noel['s] and [my] inten[t]ions before or after the [ ] incident. * * * [A] man (my brother) is being held for a crime [that] Noel and I committed. I[ ] will cooperate in any way ne[ce]ssary to gain Alex['s] fre[e]dom. * * * Noel and I are the only people responsible for the robbery of that old lady in the mall.

At the time he signed the affidavit, Juan was incarcerated in Pennsylvania, having recently commenced a forty-year prison term with a twenty-year parole disqualifier for aggravated assault, indecent sexual intercourse with a minor, kidnapping, and corrupting the morals of a minor.

Alex's lawyer, James N. Butler, Esq., explained to the court that until the preceding Friday he had assumed that at trial Juan would exonerate Alex in accordance with his affidavit. On that Friday, however, Juan's lawyer informed Butler that Juan would not testify at a joint trial. Pursuant to the procedure outlined in *State v. White*, 195 *N.J.Super.* 457, 460, 480 *A.2d* 230 (Law Div.1984), the court asked the prosecutor, Alex, and Butler to leave the room, and questioned Juan under oath about his intentions. Although Juan first stated that he had not decided whether to testify in a joint trial, he later informed the court that the "honest truth" was that he did not intend to testify if he and his brother were tried together. Juan was uncertain about whether a grant of severance would alter his decision not to take the witness stand on his brother's behalf. He had apparently anticipated that the State would offer him a "deal" in exchange for his testimony

as set forth in the affidavit. Now that no such offer was forthcoming, Juan explained, he had to devise an alternative strategy. He initially stated that even if the severance motion were granted he would not testify at his brother's trial "on [his] own will." When the court offered to try Juan's case first and asked if that would affect Juan's decision, Juan replied, "Maybe. * * * I don't know." Juan's lawyer then explained to him that Juan's interests would not be prejudiced if Juan were tried first and thereafter testified at his brother's trial, unless that testimony constituted perjury. Juan responded to subsequent court inquiries with "I might testify," "I may testify," "Most certainly I might testify," and, finally, "I haven't decided."

Upon further questioning, Juan explained that if he were to testify he would testify in accordance with his affidavit. In attempting to understand Juan's version of the events in question, the court asked whether Alex was present at the scene of the crime. The following colloquy resulted:

MR. JUAN SANCHEZ: I don't think I'm in a position to answer that to you, Your Honor.

THE COURT: Why not? You were there.

MR. JUAN SANCHEZ: Well, because I don't think that it would be right for me to say that Alex was there or not. I said that Alex wasn't there. It was me and Noel. That's what I said on the affidavit at that time.

THE COURT: You didn't say Alex wasn't there. You said you and Noel were there.

MR. JUAN SANCHEZ: Yeah.

THE COURT: But [what] I'm asking now is was he there. Was Alex there?

MR. JUAN SANCHEZ: I have to answer that?

THE COURT: Yes.

MR. JUAN SANCHEZ: Yes.

After the prosecutor, Alex, and Butler returned to the courtroom, Butler explained that his argument at trial would be that Alex "wasn't there. So he really doesn't know what happened at [the Monmouth Mall] on that particular date." In a subsequent *in camera* hearing, Alex informed the court that he was working at Freedman's Bakery in Belmar around the time of the crime and was not present at the crime scene.

The trial court denied the severance motion. The court cited Juan's failure to demonstrate that he would testify at Alex's trial if the severance motion were granted. The court also noted that "the testimony of the two defendants is not consistent on the crucial issue of the presence of Alex at the scene. And, therefore, the defendants appear to the Court to be attempting to simply use the severance as a device to get one of them acquitted." As an alternative basis for its ruling, the court found that the severance motion was not made in a timely manner under *Rule* 3:15–2(c), which, at the time of trial, required that "[a] motion for separate trial of counts of an indictment or accusation must be made within 30 days after the initial plea to the indictment or accusation."

At trial, Juan neither testified nor called any witnesses. Alex did not testify, but a representative of Freedman's Bakery testified for Alex that on January 23, 1988, Alex reported to work at 7:04 a.m. and punched out at 3:32 p.m. The jury convicted Alex and Juan of all three charged offenses.

In an unreported, *per curiam* opinion, the Appellate Division reversed Alex's conviction. The court stated that Juan could not have been expected to testify at a joint trial, but there was a substantial likelihood that he would have testified at a separate trial for Alex. The court held that because the trial court in effect foreclosed the possibility that Alex could benefit from Juan's testimony, the trial court abused its discretion in denying Alex's severance motion.

## II

*Rule* 3:7–7 allows for joinder of defendants who are "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." This Court has stated that in such cases, where "much of the same evidence is needed to prosecute each defendant, a joint trial is preferable." *State v. Brown*, 118 *N.J.* 595, 605, 573 *A.*2d 886 (1990) (citing *Richardson v. Marsh*, 481 *U.S.* 200, 210, 107 *S.Ct.* 1702, 1708, 95 *L.Ed.*2d 176, 187 (1987)); *State v. Moore*,

113 *N.J.* 239, 273, 550 *A.*2d 117 (1988); *State v. Briley,* 53 *N.J.* 498, 503, 251 *A.*2d 442 (1969). Joint trials foster an efficient judicial system, *Zafiro v. United States,* 506 *U.S.* 534, 537–38, 113 *S.Ct.* 933, 937, 122 *L.Ed.*2d 317, 324 (1993), and spare witnesses and victims the inconvenience and trauma of testifying about the same events two or more times. *Richardson, supra,* 481 *U.S.* at 210, 107 *S.Ct.* at 1708, 95 *L.Ed.*2d at 187. In addition, "joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 210, 107 *S.Ct.* at 1709, 95 *L.Ed.*2d at 187 (footnote omitted). They also allow for a " 'more accurate assessment of relative culpability—[an] advantage[ ] [that] sometimes operate[s] to the defendant's benefit.' " *Brown, supra,* 118 *N.J.* at 605, 573 *A.*2d 886 (quoting *Richardson, supra,* 481 *U.S.* at 210, 107 *S.Ct.* at 1708, 95 *L.Ed.*2d at 187).

However, the interest in judicial economy cannot override a defendant's right to a fair trial. *See State v. Coleman,* 46 *N.J.* 16, 24, 214 *A.*2d 393 (1965), *cert. denied,* 383 *U.S.* 950, 86 *S.Ct.* 1210, 16 *L.Ed.*2d 212 (1966); *State v. Manney,* 26 *N.J.* 362, 366, 140 *A.*2d 74 (1958). *Rule* 3:15–2(b) thus provides for relief from a prejudicial joinder:

> If for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation the court may order an election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief.

We have applied that Rule and its predecessor in a variety of factual settings in which defendants have claimed that a joint trial unduly prejudiced their right to a fair trial. *See, e.g., State v. Melendez,* 129 *N.J.* 48, 57–60, 609 *A.*2d 1 (1992) (rejecting defendant's claim that severance was required because of codefendant's disappearance in middle of trial); *Brown, supra,* 118 *N.J.* at 605–09, 573 *A.*2d 886 (holding that codefendants' defenses were not so antagonistic as to demand separate trials); *State v. Mayberry,* 52 *N.J.* 413, 421, 245 *A.*2d 481 (1968) (finding severance was not warranted where only basis for severance motion was that some evidence would be admissible only as to one codefendant), *cert. denied,* 393 *U.S.* 1043, 89 *S.Ct.* 673, 21 *L.Ed.*2d 593 (1969); *State v.*

*Laws,* 50 *N.J.* 159, 175–76, 233 *A.*2d 633 (1967) (finding severance was not required even though evidence against one defendant was stronger than that against the other and third defendant was acquitted in course of trial), *cert. denied,* 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968); *State v. Sinclair,* 49 *N.J.* 525, 550, 231 *A.*2d 565 (1967) (holding that trial court did not abuse its discretion in denying severance motion premised on argument that defendant was prejudiced by being jointly tried with mentally disturbed codefendant); *State v. Broxton,* 49 *N.J.* 373, 376–77, 230 *A.*2d 489 (1967) (rejecting defendants' severance argument because they were not prejudiced by admission into evidence of redacted confessions of their codefendants). We have noted as a general matter that "[t]he decision whether to grant severance rests within the trial court's sound discretion." *Brown, supra,* 118 *N.J.* at 603, 573 *A.*2d 886; *accord Laws, supra,* 50 *N.J.* at 175, 233 *A.*2d 633; *Manney, supra,* 26 *N.J.* at 368, 140 *A.*2d 74.

We have not heretofore addressed comprehensively the claim asserted here that a joint trial prevented a defendant from obtaining the exculpatory testimony of his codefendant. *But see Manney, supra,* 26 *N.J.* at 369, 140 *A.*2d 74 (summarily rejecting severance argument premised on need for codefendant's testimony because defendant failed to show that codefendant would have testified at separate trial); *cf. Lamble v. State,* 96 *N.J.L.* 231, 233, 114 *A.* 346 (E. & A.1921) (summarily affirming trial court decision to sever joint trial that was based on State's need to call codefendant as witness against defendant). The severance issue frequently arises because of the codefendant's concern that if he provides the "exculpatory" testimony he necessarily inculpates himself. *See* Robert O. Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices,* 77 Mich.L.Rev. 1379, 1438, 1441 (1979). A codefendant's decision to testify in a joint trial may also afford the State an opportunity to inform the jury of his criminal record, which otherwise might have been inadmissible. *Id.* at 1441. *See generally State v. Brunson,* 132 *N.J.* 377, 383–93, 625 *A.*2d 1085 (1993) (discussing use of prior criminal record to impeach testifying defendant); *State v. Sands,* 76 *N.J.* 127, 132–

47, 386 *A*.2d 378 (1978) (same). Thus, if called to testify, the codefendant is likely to assert his Fifth Amendment privilege against self-incrimination, thereby frustrating a possibly innocent defendant's attempt to present exculpatory testimony to the jury through the codefendant.

The Appellate Division confronted such a situation in *State v. Morales*, 138 *N.J.Super.* 225, 350 *A*.2d 492 (App.Div.1975). The defendants in that case, Morales and Pitkewicz, had been indicted for violating State lottery laws. At their joint trial, Morales informed the trial court of his intent to call Pitkewicz as a witness, "intimating that his testimony would be exculpatory [as to] Morales." 138 *N.J.Super.* at 228, 350 *A*.2d 492 (internal quotation marks omitted). Pitkewicz's attorney then explained to the court that his client would invoke his constitutional right not to incriminate himself if called to the witness stand. The trial court denied Morales's ensuing severance motion, and the Appellate Division affirmed. The unanimous panel found that Morales was not prejudiced by the joint trial, because "it ha[d] not been demonstrated * * * that if Pitkewicz were called as a witness at a separate trial, he would be willing to give testimony tending to exculpate Morales." *Id.* at 230, 350 *A*.2d 492. The court also noted that the nature of the allegedly exculpatory testimony had never been disclosed. *Ibid.*

■ Because joint trials account for almost one-third of all federal criminal trials, *Richardson, supra,* 481 *U.S.* at 209, 107 *S.Ct.* at 1708, 95 *L.Ed.*2d at 187, the federal courts have dealt extensively with severance issues. *See* 1 Charles A. Wright, *Federal Practice and Procedure* §§ 223–225 (1982 & Supp.1995) (citing cases). In general, the federal courts have demonstrated a strong preference for joint trials. *Id.* § 223. Although earlier cases were tolerant of severance applications, *see, e.g., United States v. Shuford,* 454 *F*.2d 772 (4th Cir.1971); *Byrd v. Wainwright,* 428 *F*.2d 1017 (5th Cir.1970); *United States v. Echeles,* 352 *F*.2d 892 (7th Cir.1965), severance requests in the federal courts are now routinely denied. Wright, *supra,* § 223.

Federal Rule of Criminal Procedure 14, which provides for relief from joinder, reflects the same concern about the potential prejudice to the jointly tried defendant as does our *Rule* 3:15–3(b). In applying the federal rule to cases in which a defendant moves for severance based on the need for a codefendant's testimony, a plurality of the federal circuits have required the moving defendant to demonstrate: (1) a *bona-fide* need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed testify at a separate trial. *See, e.g., United States v. Smith*, 46 *F*.3d 1223, 1231 (1st Cir.), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 176, 133 *L.Ed.*2d 116 (1995); *United States v. Ramirez*, 954 *F*.2d 1035, 1037 (5th Cir.), *cert. denied,* 505 *U.S.* 1211, 112 *S.Ct.* 3010, 120 *L.Ed.*2d 884 (1992); *United States v. Smith*, 918 *F*.2d 1551, 1560 (11th Cir.1990); *United States v. Ford*, 870 *F*.2d 729, 731 (D.C.Cir.1989); *United States v. Parodi*, 703 *F*.2d 768, 779 (4th Cir.1983). Once the defendant makes this threshold showing the trial court must then: (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion. *See, e.g., Ramirez, supra*, 954 *F*.2d at 1037; *Smith, supra*, 918 *F*.2d at 1560–61; *Ford, supra*, 870 *F*.2d at 731; *Parodi, supra*, 703 *F*.2d at 779 (considering, in addition, likelihood that codefendant's testimony would be impeached); *see also Smith, supra*, 46 *F*.3d at 1231 (omitting factor two, and also considering likelihood that codefendant's testimony would be subject to damaging impeachment).

■ The remaining circuits employ standards that are "similar * * * with only unimportant differences in wording." Wright, *supra*, § 225 n. 5; *see, e.g., United States v. Williams*, 31 *F*.3d 522, 528 (7th Cir.1994) (holding that defendant must show that codefendant's testimony would be exculpatory, that codefendant would in fact testify at separate trial, and that testimony would bear on defendant's case); *United States v. Vue*, 13 *F*.3d 1206,

1210 (8th Cir.1994) (holding that defendant must show that codefendant would testify at separate trial and that testimony would be exculpatory); *United States v. Mariscal,* 939 *F.*2d 884, 885 (9th Cir.1991) (noting that trial court must weigh defendant's intent to have codefendant testify, weight and credibility of predicted testimony, probability that testimony will materialize, economy of joint trial, and degree to which testimony is exculpatory); *United States v. Paulino,* 935 *F.*2d 739, 752 (6th Cir.) (holding that defendant must show that codefendant will testify at separate trial and that testimony will be exculpatory), *cert. denied,* 502 *U.S.* 914, 112 *S.Ct.* 315, 116 *L.Ed.*2d 257 (1991); *United States v. Rogers,* 925 *F.*2d 1285, 1287 (10th Cir.) (considering as relevant factors likelihood that codefendant would testify at defendant's separate trial, significance of testimony in relation to defendant's theory of defense, exculpatory nature and effect of testimony, likelihood that codefendant's testimony would be impeached, extent of prejudice caused by absence of testimony, interests of judicial administration and economy, and timeliness of severance motion), *cert. denied,* 501 *U.S.* 1211, 111 *S.Ct.* 2812, 115 *L.Ed.*2d 985 (1991); *United States v. Boscia,* 573 *F.*2d 827, 832 (3d Cir.) (emphasizing following factors: likelihood of codefendant testifying; degree to which testimony would be exculpatory; degree to which codefendant could be impeached; and judicial economy), *cert. denied,* 436 *U.S.* 911, 98 *S.Ct.* 2248, 56 *L.Ed.*2d 411 (1978); *United States v. Finkelstein,* 526 *F.*2d 517, 523–24 (2d Cir.1975) (same), *cert. denied,* 425 *U.S.* 960, 96 *S.Ct.* 1742, 48 *L.Ed.*2d 205 (1976). All of the federal circuits agree that the trial court is to be given broad discretion in ruling on severance motions. *See, e.g., United States v. Reavis,* 48 *F.*3d 763, 767 (4th Cir.), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 2597, 132 *L.Ed.*2d 844 (1995); *United States v. Torres–Maldonado,* 14 *F.*3d 95, 104 (1st Cir.), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 193, 130 *L.Ed.*2d 125 (1994).

■ Although the standards applied by some federal courts for granting severance motions appear somewhat detailed, the courts have focused primarily on two factors: (1) the exculpatory nature

of the proffered testimony; and (2) the showing that the testimony would be forthcoming in a separate trial. *See, e.g., United States v. Wilwright,* 56 *F.*3d 586, 591 (5th Cir.), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 345, 133 *L.Ed.*2d 242 (1995); *United States v. McKinney,* 53 *F.*3d 664, 674 (5th Cir.), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 261, 133 *L.Ed.*2d 184 (1995); *Reavis, supra,* 48 *F.*3d at 767–68; *United States v. Williams,* 31 *F.*3d 522, 528 (7th Cir. 1994); *United States v. Lucht,* 18 *F.*3d 541, 554 (8th Cir.), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 363, 130 *L.Ed.*2d 316 (1994); *United States v. Washington,* 12 *F.*3d 1128, 1133–34 (D.C.Cir.), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 98, 130 *L.Ed.*2d 47 (1994); *United States v. Nason,* 9 *F.*3d 155, 159 (1st Cir.1993), *cert. denied,* —— *U.S.* ——, 114 *S.Ct.* 1331, 127 *L.Ed.*2d 678 (1994); *United States v. Lopez,* 6 *F.*3d 1281, 1285 (7th Cir.1993); *United States v. Adams,* 1 *F.*3d 1566, 1579 (11th Cir.1993), *cert. denied,* —— *U.S.* ——, 114 *S.Ct.* 1310, 127 *L.Ed.*2d 660 (1994); *United States v. Taren–Palma,* 997 *F.*2d 525, 533 (9th Cir.1993), *cert. denied,* —— *U.S.* ——, 114 *S.Ct.* 1648, 128 *L.Ed.*2d 368 (1994); *United States v. Washington,* 969 *F.*2d 1073, 1080 (D.C.Cir.1992), *cert. denied,* 507 *U.S.* 922, 113 *S.Ct.* 1287, 122 *L.Ed.*2d 679 (1993); *United States v. Rusher,* 966 *F.*2d 868, 878 (4th Cir.), *cert. denied,* 506 *U.S.* 926, 113 *S.Ct.* 351, 121 *L.Ed.*2d 266 (1992); *United States v. Villarreal,* 963 *F.*2d 725, 731 (5th Cir.), *cert. denied,* 506 *U.S.* 927, 113 *S.Ct.* 353, 121 *L.Ed.*2d 267 (1992); *United States v. Tolliver,* 937 *F.*2d 1183, 1188–89 (7th Cir.), *cert. denied,* 502 *U.S.* 919, 112 *S.Ct.* 329, 116 *L.Ed.*2d 269 (1991); *United States v. Gonzalez,* 933 *F.*2d 417, 425 (7th Cir.1991); *United States v. Beale,* 921 *F.*2d 1412, 1428–29 (11th Cir.), *cert. denied,* 502 *U.S.* 829, 112 *S.Ct.* 100, 116 *L.Ed.*2d 71 (1991); *United States v. Foote,* 920 *F.*2d 1395, 1399 (8th Cir.1990), *cert. denied,* 500 *U.S.* 946, 111 *S.Ct.* 2246, 114 *L.Ed.*2d 487 (1991); *Smith, supra,* 918 *F.*2d at 1561; *United States v. Rocha,* 916 *F.*2d 219, 232 (5th Cir.1990), *cert. denied,* 500 *U.S.* 934, 111 *S.Ct.* 2057, 114 *L.Ed.*2d 462 (1991); *United States v. McConnell,* 903 *F.*2d 566, 571 (8th Cir.1990), *cert. denied,* 498 *U.S.* 1106, 111 *S.Ct.* 1011, 112 *L.Ed.*2d 1093 (1991).

In addressing whether the proffered testimony is sufficiently exculpatory, the federal courts have repeatedly stated that testimony does not qualify as "exculpatory" if the testimony is insignificant, cumulative, or merely a vague or conclusory assertion of innocence. *See, e.g., Reavis, supra,* 48 *F.*3d at 767–68; *Smith, supra,* 46 *F.*3d at 1232; *Vue, supra,* 13 *F.*3d at 1210; *Taren–Palma, supra,* 997 *F.*2d at 533; *United States v. Van Hemelryck,* 945 *F.*2d 1493, 1501 (11th Cir.1991); *Beale, supra,* 921 *F.*2d at 1428–29; *Foote, supra,* 920 *F.*2d at 1399; *Smith, supra,* 918 *F.*2d at 1561; *Ford, supra,* 870 *F.*2d at 732; *United States v. Espinosa,* 771 *F.*2d 1382, 1408–09 (10th Cir.), *cert. denied,* 474 *U.S.* 1023, 106 *S.Ct.* 579, 88 *L.Ed.*2d 561 (1985); *United States v. Johnson,* 713 *F.*2d 633, 641 (11th Cir.1983), *cert. denied,* 465 *U.S.* 1081, 104 *S.Ct.* 1447, 79 *L.Ed.*2d 766 (1984); *Parodi, supra,* 703 *F.*2d at 780; *United States v. DeSimone,* 660 *F.*2d 532, 540 (5th Cir. Unit B Nov.1981), *cert. denied,* 455 *U.S.* 1027, 102 *S.Ct.* 1732, 72 *L.Ed.*2d 149 (1982).

Concerning the likelihood that a codefendant will testify, the federal courts generally have held that the moving defendant cannot establish that the codefendant's testimony would be forthcoming in a separate trial if the codefendant's willingness to testify is conditioned on his being tried first. *See, e.g., Reavis, supra,* 48 *F.*3d at 767; *United States v. Jagim,* 978 *F.*2d 1032, 1040 (8th Cir.1992), *cert. denied,* 508 *U.S.* 952, 113 *S.Ct.* 2447, 124 *L.Ed.*2d 664 (1993); *Ford, supra,* 870 *F.*2d at 731–32; *Parodi, supra,* 703 *F.*2d at 779. Those courts have observed that were they to allow defendants to dictate the order of their trials based on a contingent proffer of exculpatory testimony, the defendants would receive a benefit unavailable to them had they been indicted separately. *See, e.g., Reavis, supra,* 48 *F.*3d at 767; *Parodi, supra,* 703 *F.*2d at 780. Those courts are also fearful of encouraging perjury:

Were we to accede to the co-defendant's demand [regarding the order of the trials], we would "create a situation where, following his own trial, the witness would be more inclined to 'throw a bone' to his codefendants by testifying favorably to them because his own case had been disposed of and he had little to lose by testifying."

[*Reavis, supra,* 48 *F.*3d at 767 (quoting *United States v. Becker,* 585 *F.*2d 703, 706 (4th Cir.1978), *cert. denied,* 439 *U.S.* 1080, 99 *S.Ct.* 862, 59 *L.Ed.*2d 50 (1979)).]

That approach routinely results in the denial of severance motions, for it is the rare defendant who makes an unconditional offer to exculpate his codefendant. Because a criminal defendant's prior statements are admissible against him, a defendant with the ability to exculpate his codefendant generally will exercise his Fifth Amendment privilege rather than inculpate himself, unless his own trial already has been resolved. *See* Dawson, *supra,* at 1441.

State courts that have confronted severance requests based on the need for a codefendant's testimony typically have followed the approach taken by the federal courts. *See, e.g., Lumpkin v. United States,* 586 *A.*2d 701, 707 (D.C.) (stating that moving defendant must satisfy following criteria: exculpatory nature of desired testimony; desire to present codefendant's testimony; willingness of codefendant to testify at separate trial; and demands of judicial administration), *cert. denied,* 502 *U.S.* 849, 112 *S.Ct.* 151, 116 *L.Ed.*2d 116 (1991); *State v. Talavera,* 243 *So.*2d 595, 597 (Fla.1971) (noting that defendant must show exculpatory nature of codefendant's testimony, that codefendant is willing to testify at separate trial, that codefendant would not testify at joint trial, and that desired testimony is relevant, material, competent, and noncumulative); *Huffman v. State,* 543 *N.E.*2d 360, 368 (Ind.1989) (considering following criteria: exculpatory effect of testimony; likelihood that codefendant would testify at separate trial; and exculpatory nature and significance of testimony, or prejudice to defendant if testimony is unavailable), *cert. denied,* 497 *U.S.* 1011, 110 *S.Ct.* 3257, 111 *L.Ed.*2d 767 (1990), *overruled on other grounds, Street v. State,* 567 *N.E.*2d 102 (Ind.1991); *State v. Nott,* 234 *Kan.* 34, 669 *P.*2d 660, 665 (1983) (adopting Fifth Circuit standard verbatim); *State v. Turner,* 365 *So.*2d 1352, 1354 (La. 1978) (stating that defendant must show that codefendant would testify in separate trial and that testimony would be exculpatory); *People v. Bornholdt,* 33 N.Y.2d 75, 350 N.Y.S.2d 369, 378–80, 305

*N.E.*2d 461, 468 (1973) (noting importance of showing need for codefendant's testimony, that testimony would be exculpatory, that codefendant would testify at separate trial, and that severance motion was timely), *cert. denied,* 416 *U.S.* 905, 94 *S.Ct.* 1609, 40 *L.Ed.*2d 109 (1974); *State v. Winckler,* 260 *N.W.*2d 356, 364–65 (S.D.1977) (describing three-factor test: whether defendant desires to use codefendant's testimony; whether testimony would be exculpatory; and whether codefendant is likely to testify at separate trial).

Two states, however, have taken a very different approach, granting jointly indicted defendants the right to severance in all felony cases. *See Miss.Code Ann.* § 99–15–47; *Vt.R.Crim.P.* 14. Texas has also departed from the federal approach by providing that in all cases where severance is granted the defendants may dictate the order in which they are to be tried. *See Tex.Crim.Pro. Code Ann.* § 36.10.

### III

■ Evaluating severance motions that are based on the need for a codefendant's testimony requires a balancing of the State's interest in the economy of a joint trial and a criminal defendant's interest in presenting exculpatory evidence to the trier of fact. Jointly indicted defendants generally should be tried together to avoid unnecessary, duplicative litigation. *Brown, supra,* 118 *N.J.* at 605, 573 *A.*2d 886. "Nevertheless, a single joint trial, however desirable from the point of view of efficient and expeditious criminal adjudication, may not be had at the expense of a defendant's right to a fundamentally fair trial." *United States v. Echeles,* 352 *F.*2d 892, 896 (7th Cir.1965). Indeed, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 *U.S.* 284, 302, 93 *S.Ct.* 1038, 1049, 35 *L.Ed.*2d 297, 312 (1973) (holding that Mississippi's voucher rule and hearsay rules unconstitutionally restricted defendant's right to defend against criminal charges against him); *see Washington v. Texas,* 388 *U.S.* 14, 23, 87 *S.Ct.*

1920, 1925, 18 *L.Ed.*2d 1019, 1025 (1967) (holding that Texas statute providing that accomplices may not testify on each other's behalf violated defendant's Sixth Amendment right to compulsory process for obtaining witnesses in his favor); *see also In re Farber*, 78 *N.J.* 259, 274, 394 *A.*2d 330 (holding that application of State "Shield Law" statute protecting media's confidential sources denied defendant his state constitutional right to compulsory process), *cert. denied*, 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978). On the other hand, neither our Rules Governing Criminal Practice nor the Constitution gives a defendant the absolute right to elicit testimony from any person he may desire. *See United States v. Gay*, 567 *F.*2d 916, 919 (9th Cir.) (describing situations in which witness's testimony may be unavailable to criminal defendant), *cert. denied*, 435 *U.S.* 999, 98 *S.Ct.* 1655, 56 *L.Ed.*2d 90 (1978).

To reconcile those competing concerns in a given case, the trial court must focus on the substance and quality of the proffered testimony, and attempt to ascertain the testimony's exculpatory value. The court should distinguish between credible, substantially exculpatory testimony and testimony that is insignificant, subject to damaging impeachment, or unduly vague, conclusory, or cumulative. Where the testimony rendered unavailable by a joint trial is not substantially exculpatory, a defendant has not suffered cognizable prejudice for the purpose of *Rule* 3:15–2(b). Where, however, the proffered testimony is likely to be significantly exculpatory, denying the defendant's severance motion could be highly prejudicial to the defendant, and potentially could lead to the conviction of an innocent person. *See* Dawson, *supra*, at 1444. When such substantially exculpatory testimony is at stake, procedural convenience is not an adequate justification for a trial court's decision that precludes a defendant from calling his codefendant to the witness stand.

The same principles apply when a codefendant's offer to testify is conditioned both on the severance motion being granted *and* on his own case being tried first. Because a code-

fendant is likely to incriminate himself while exculpating his alleged accomplice, the codefendant's reluctance to provide such testimony until his own trial has concluded is understandable, and finds constitutional support in the Fifth Amendment. For a trial court, the exculpatory value of the proffered testimony remains the focus of the analysis. Thus, if the proffered testimony is substantially exculpatory, the court should accommodate a codefendant's reasonable request regarding the timing of the separate trials unless there is a compelling reason not to do so. *See State v. Scovil,* 159 *N.J.Super.* 194, 199–201, 387 *A.*2d 413 (Law Div. 1978) (granting State's severance motion and defendants' ensuing request that defendant with exculpatory information about codefendants be tried first); *see also* Peter Westen, *The Compulsory Process Clause,* 73 Mich.L.Rev. 71, 145 (1974) ("[W]here a certain sequence of trials is demonstrably likely to deny the accused an exculpatory witness, the court's ordinary discretion over trial order must yield to the commands of the [Sixth Amendment's] compulsory process clause."). Nevertheless, because severance will increase the risk that a codefendant to be tried first will subsequently commit perjury in an effort to exonerate the accomplice, the trial court confronted with a motion for severance must carefully evaluate a codefendant's conditional offer to testify. Unless the court is persuaded that the reliability and trustworthiness of the proffered testimony significantly outweigh the risk of perjury, severance should be denied. That is, "[c]redibility is for the jury, but the [court] is not required to sever on patent fabrications." *Byrd, supra,* 428 *F.*2d at 1021; *cf. State v. Robinson,* 253 *N.J.Super.* 346, 366–67, 601 *A.*2d 1162 (App.Div.) (upholding denial of defendant's motion for new trial that was based on availability of exculpatory testimony from codefendant, because codefendant's proffered testimony appeared to be fabricated), *certif. denied,* 130 *N.J.* 6, 611 *A.*2d 646 (1992).

The parties in this appeal have urged us to adopt the multi-pronged federal standard, *see supra* at 284–286, 670 *A.*2d at 540–541 as an aid to trial courts attempting to reconcile the

concerns presented by severance motions based on the need for a codefendant's testimony. We agree fully with the federal courts' tendency to grant severance in multi-defendant criminal cases only sparingly. The federal standard embraces the factors that are relevant to determining the appropriateness of severance. With respect to the probative worth of the proffered testimony, those factors encompass weight, reliability, and credibility, including whether the codefendant is subject to impeachment; the testimony's materiality measured by its importance to the defendant's case, as opposed to whether it is cumulative, collateral or incidental; and, the likelihood that the testimony will in fact be produced. Accordingly, we adopt a broad standard that reflects those factors. We hold that the trial court should sever a joint trial if the court is reasonably certain that (1) the defendant will call his codefendant as a witness in a separate trial; (2) the codefendant, although unwilling to testify at a joint trial, will testify at a separate trial either prior or subsequent to his own trial; and (3) the codefendant's proffered testimony will be credible and substantially exculpatory. That approach comports generally with the federal standard, differing somewhat in that it recognizes that a codefendant's request to be tried before he testifies for the defendant is only a factor to be considered in the severance determination; such a request may reflect a codefendant's understandable desire to assist a defendant without prejudicing his or her own chances for acquittal and should not necessarily be deemed an unreasonable condition signaling an unwillingness to testify. A codefendant's conditional offer to testify should carefully be assessed by a trial court in determining whether the risk of perjury outweighs the likelihood that the proffered testimony is trustworthy. But the focus of the severance analysis should be on the exculpatory value of the proffered testimony, and not on whether the defendant requests to be tried before his codefendant.

Applying the standard we have adopted to the case at hand, we conclude that the trial court correctly rejected Alex's severance motion. Notwithstanding Alex's desire to call Juan to

the witness stand, there was not a sufficient showing that a grant of severance would have altered Juan's decision not to testify. During the *in camera* hearing, Juan consistently avoided making a commitment to testify at a separate trial for Alex. Even after the court offered to try Juan's case first, Juan equivocally responded, "I might testify," "I may testify," "Most certainly I might testify," "Maybe," "I don't know," and "I haven't decided." A severance motion should not be granted on the basis of a mere possibility that the codefendant will testify at a separate trial. *See, e.g., Lopez, supra,* 6 *F.*3d at 1285; *Tolliver, supra,* 937 *F.*2d at 1189.

That Juan's proffered testimony did not substantially exculpate Alex constitutes additional justification for the trial court's decision to deny Alex's severance motion. Although Juan claimed in his affidavit that only he and Noel Manuel were "responsible" for the robbery, Juan admitted to the trial court that Alex was present during the commission of the crime. Absent a more specific explanation of Alex's role in the robbery, Juan's affidavit and proffered testimony are not substantially exculpatory, especially in view of Alex's insistence that he was not present at the scene of the crime. *See N.J.S.A.* 2C:2–6 (providing for accomplice liability). That discrepancy in the brothers' stories undermines the exculpatory value of the proffered testimony and supports the trial court's suspicion that the brothers were attempting to use the severance motion as a ploy to get one of them acquitted.

Moreover, the eye-witness testimony that Alex drove the getaway vehicle from the crime scene casts doubt on Juan's assertion that Alex was not "responsible" for the robbery. We acknowledge that a severance motion should not be denied simply because the court infers that the codefendant's proposed exculpatory testimony will be less credible than the testimony of the State's witnesses. Nevertheless, in assessing whether proffered testimony will be substantially exculpatory for purposes of determining whether to grant severance, a trial court necessarily must evaluate the proposed testimony in the context of the apparent weight of the State's case. Accordingly, a court properly could conclude that

the eye-witness accounts not only are probative of Alex's complicity in the crime, but also corroborate Juan's admission that Alex was present at the crime scene. Moreover, the trial court also was entitled to consider that Juan's credibility would have been subject to impeachment on the basis of his Pennsylvania convictions for aggravated assault, kidnapping, and other offenses. *See Sands, supra,* 76 *N.J.* at 147, 386 *A.*2d 378. Thus, the likelihood that Juan's proposed testimony would have exculpated Alex was minimal.

Because Alex has failed to show that substantially exculpatory testimony would have been forthcoming had his severance motion been granted, he has not demonstrated prejudice sufficient to compel severance under *Rule* 3:15–2(b). The trial court did not abuse its discretion in denying Alex's severance motion.

### IV

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*For affirmance*—None.