742 A.2d 1031 (2000)
327 N.J. Super. 212
STATE of New Jersey, Plaintiff-Respondent,
v.
Angela DeROXTRO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 13, 1999.
Decided January 10, 2000.
*1032 Ivelisse Torres, Public Defender, for defendant-appellant (Dana Davis Teague, Designated Counsel, of counsel and on the brief).
E. David Millard, Ocean County Prosecutor, for plaintiff-respondent (Thomas Cannavo, Assistant Prosecutor, of counsel and on the brief).
Before Judges MUIR, Jr., CUFF and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.A.D.
Angela DeRoxtro was tried under an Ocean County indictment charging her with the murder of Michael Brandt. A jury found her guilty of the lesser offense of aggravated assault under N.J.S.A. 2C:12-1b(1), and she was sentenced to ten years in prison.[1] On her appeal from that *1033 conviction and sentence, defendant makes the following arguments:
POINT I. THE TRIAL COURT'S DENIAL OF ANGELA DEROXTRO'S MOTION FOR SEPARATE TRIAL WAS REVERSIBLE ERROR ENTITLING HER TO A NEW TRIAL. POINT II. THE TRIAL COURT'S FAILURE TO ADMIT THE HEARSAY STATEMENTS OF NEIL LABRANCHE WAS AN ABUSE OF DISCRETION.
POINT III. THE TRIAL COURT'S DENIAL OF ANGELA DEROXTRO'S MOTION FOR JNOV WAS IN ERROR.
POINT IV. THE SENTENCE TO ANGELA DEROXTRO WAS EXCESSIVE.
We are satisfied that the court did not abuse its discretion in denying defendant's requested severance; that the court's rejection of the hearsay statement of Neil LaBranche was not error; that there was no basis to set aside the jury's verdict; and there is no reason to conclude that the sentence was excessive. Accordingly, we affirm.
In April 1995, Michael Brandt, Angela DeRoxtro, Neil LaBranche, and Julie Hurt, lived together in an apartment in Seaside Heights.[2] According to Hurt, a principal witness at trial, the relationship between Brandt and defendant was "stormy," with frequent bickering and arguing. Hurt also said that defendant drank a lot, and Hurt blamed most of the couple's quarreling on defendant.
On the morning of April 17, 1995, Brandt and defendant began quarreling about responsibility for cleaning the apartment. The quarreling continued on and off during the day and into the evening. In addition to the cleaning issue, defendant said she wanted Brandt out of the apartment. He refused to leave, adding that he would not do so unless and until he received repayment of the rent he had already paid.
The quarreling culminated in a drinking game orchestrated by defendant at around 9:00 or 9:30 p.m. The game involved a deck of cards, with the participants instructing one another to drink if he or she incorrectly guessed the identification of a particular card. Hurt testified that defendant spoke privately to her and LaBranche and arranged to have the three of them cooperate against Brandt. Defendant said Brandt never drank and she wanted to see how he would act if he consumed a large quantity of alcohol. As the game proceeded, with Brandt being called upon to drink more than the others, Brandt became angry, complained that he had an ulcer and should not drink, and said he would not participate. He spoke loudly and angrily, and, according to Hurt, both she and defendant warned him against waking Hurt's baby.
Hurt also said that on prior occasions, defendant had asked LaBranche to take Brandt away from the apartment and beat him up. On April 17, she repeated that request, more than once.
During the evening, as the drinking game was in progress, LaBranche approached Brandt from the rear and struck him on the head with a set of "nunchakus" which had been left in the apartment some time ago and had been kept in defendant's dresser drawer.[3] Kelly Lewis said La
*1034 Branche hit Brandt five times with the nunchakus and then kicked and punched him. Hurt's testimony was consistent with that recitation, although she did not specify the number of blows. She did say there was more than one blow and that LaBranche had also punched Brandt "in the side of his face ... [and] kicked him in the ribs."
Defendant then left the apartment and called the police, with Julie Hurt and Kelly joining her. When the police arrived, Brandt was sitting in the bathroom with blood on his face. He was taken to the hospital, but he died the next day.
At trial, Hurt and Kelly testified essentially as summarized above. In addition, however, Hurt said that defendant had asked her to lie to the police and say that Brandt had instigated the fight with LaBranche, and that LaBranche had struck Brandt only once. Initially she did as defendant asked, but she subsequently told the truth, notwithstanding a later request from defendant again asking her to lie.
The State's theory that defendant was guilty of murder was based on its claim that she had instigated the murder committed by LaBranche and she had provided him with the murder weapon. As noted, however, the jury did not find defendant guilty of murder, but did find her guilty of second degree aggravated assault.
I
Defendant claims that rejection of her severance request constituted prejudicial error because, had the request been granted, and had LaBranche been tried first, LaBranche would have provided exculpatory testimony at her trial. Under those circumstances, she argues, the rule of State v. Sanchez, 143 N.J. 273, 670 A.2d 535 (1996), required a severance. Defendant's paraphrase of the Sanchez holding is correct. Her claim that she satisfied the requirements of Sanchez, however, is incorrect.
In Sanchez, the Court noted that when there is more than one defendant, and "`much of the same evidence is needed to prosecute each defendant, a joint trial is preferable.'" State v. Sanchez, supra, 143 N.J. at 281, 670 A.2d 535, (quoting State v. Brown, 118 N.J. 595, 605, 573 A.2d 886 (1990)). However, notwithstanding considerations of judicial efficiency which may favor a joint trial, "the interest in judicial economy cannot override a defendant's right to a fair trial." Id. at 282, 670 A.2d 535. Thus, R. 3:15-2(b) provides relief from what would be a prejudicial joinder and "as a general matter ... `[t]he decision whether to grant severance rests within the trial court's sound discretion.'" Id. at 282-83, 670 A.2d 535 (citation omitted).
The fact that a co-defendant may provide exculpatory testimony if two defendants are tried separately, may provide a basis for severance. Thus,
[e]valuating severance motions that are based on the need for a co-defendant's testimony requires a balancing of the State's interest in the economy of a joint trial and a criminal defendant's interest in presenting exculpatory evidence to the trier of fact. Jointly indicted defendants generally should be tried together to avoid unnecessary, duplicative litigation. "Nevertheless, a single joint trial, however desirable from the point of view of efficient and expeditious criminal adjudication, may not be had at the expense of a defendant's right to a fundamentally fair trial."
[Id. at 290, 670 A.2d 535 (citations omitted).]
In weighing such a request and evaluating the competing interests, the key considerations are "the exculpatory nature of *1035 the proffered testimony; and ... [a] showing that the testimony would be forthcoming in a separate trial." Id. at 286-87, 670 A.2d 535. The focus should be "on the substance and quality of the proffered testimony," and the court should "distinguish between credible, substantially exculpatory testimony and testimony that is insignificant, subject to damaging impeachment, or unduly vague conclusory, or cumulative." Id. at 291, 670 A.2d 535. Where it is shown that the co-defendant will provide "credible" and "substantially exculpatory" testimony at a separate trial (even if the co-defendant conditions that willingness on his being tried first), the trial court should grant a severance. Thus the Court summarized its conclusions:
We hold that the trial court should sever a joint trial if the court is reasonably certain that (1) the defendant will call his co-defendant as a witness in a separate trial; (2) the co-defendant, although unwilling to testify at a joint trial, will testify at a separate trial either prior or subsequent to his own trial; and (3) the codefendant's proffered testimony will be credible and substantially exculpatory.... A co-defendant's conditional offer to testify should carefully be assessed by a trial court in determining whether the risk of perjury outweighs the likelihood that the proffered testimony is trustworthy. But the focus of the severance analysis should be on the exculpatory value of the proffered testimony, and not on whether the defendant requests to be tried before his codefendant.
[Id. at 293, 670 A.2d 535.]
In Sanchez, the Court concluded that the defendant had not made the kind of showing which required the trial court to grant the requested severance. The co defendant had been equivocal as to whether he would testify for the defendant even with a severance. His brief description of what he would say if he testified was not clearly exculpatory of the defendant, and actually suggested that the defendant was implicated in the crime. Because the defendant "failed to show that substantially exculpatory testimony would have been forthcoming had his severance motion been granted," the Court found no prejudice and thus no error in denying the requested severance. Id. at 295, 670 A.2d 535.
The same is true here. Even if DeRoxtro's request for severance had been granted, and even if LaBranche had been tried first, there was no clear showing that LaBranche would testify for DeRoxtro in a subsequent trial or that his testimony (if there was any testimony) would exculpate her. To explore those issues, the trial court had proposed a closed, in camera session, in which LaBranche would provide his testimony concerning DeRoxtro and the transcript of that proceeding would be sealed. LaBranche's attorney, however, rejected that procedure. In what would seem to be carefully chosen words, counsel said that "without disclosing information that is privileged," he would anticipate that "my client ... would be willing to testify; and obviously, his testimony would be anticipated to be entirely exculpatory .... [of DeRoxtro]." However, counsel also said that,
Mr. LaBranche will not participate in an in camera proceeding.... But at this point, I can indicate that based upon all the information conveyed to me that is not in the privileged nature, that I anticipate that ... he will not testify at his trial and that if called upon to testify at his co-defendant's trial, he will, in fact, appear.
He will not be raising objections to that. And I anticipate that, based upon non-privileged information, that that would be exculpatory entirely as to defendant, as to [DeRoxtro].
LaBranche himself said nothing. Thus, the court had nothing before it except counsel's general statement as to what he believed his client would probably do if a severance were granted. There were no *1036 details of the so-called exculpatory testimony and there was no way the court could perform the evaluation called for by Sanchez. Nor was there any way to insure that LaBranche would perform as counsel said he believed he would perform, or whether, for some reason, LaBranche might simply decide not to testify once his own trial had been concluded.
Obviously, even with an in camera proceeding such as that in Sanchez, a co-defendant such as LaBranche might renege on a promise to testify in a trial subsequent to his own. But with such testimony, even with a sealed transcript, the chances thereof would seem considerably less. And, the court would have had a direct opportunity to hear, weigh and evaluate both the likelihood that the co-defendant would conform with his stated intention and to weigh the significance and weight of such exculpatory testimony.
In short, the weighing process which the Sanchez Court found critical in determining whether to grant or deny a severance could not be effected here. The two points that the Court held must be shown for a defendant to be entitled to a severancea reasonable certainty that the co-defendant will testify and a reasonable certainty that the testimony will be exculpatorywere not established. Under those circumstances, there was no abuse of discretion and no error in rejecting the requested severance.
II
Julie Hurt testified, before the grand jury and in a voir dire hearing before the trial court, that on the day after the murder LaBranche called her from jail. She said that during the conversation, she asked him two questions: First, how he had obtained the nunchakus; and second, why he had taken the nunchakus. To the first question, LaBranche replied that he had taken the nunchakus "out of [defendant DeRoxtro's] dresser, put them behind his shirt, so nobody could see them, and he put his shirt on and then put them inside his jeans." As to the second question, LaBranche said "he took the nunchakus because he was scared Michael [Brandt] would do something to her," apparently referring to Hurt, DeRoxtro, Kelly or Hurt's baby.
The prosecutor argued that Hurt's recitation of how LaBranche said he obtained the weapon was admissible under R. 803(c)(25) as a statement made against LaBranche's penal interest. Neither defense counsel disputed that proposition. Rather, each claimed that the second statementLaBranche's comment as to why he had taken the nunchakusshould also be admitted because it constituted part of the first statement. The trial court rejected the argument and DeRoxtro claims that rejection constituted reversible error.
There are two theories under which a hearsay statement which is admissible because it is against the declarant's penal interest, might justify admission of a related statement which does not, by itself, qualify as a declaration against interest. First, it could be found that the trustworthiness of the first statement "rubbed off" on the second, imbued it with the same credibility, and thus enabled the second statement to "tag along" and be admitted with the first statement. Second, the later statement could be admitted on a theory of "completeness"that is, it would be admitted for the purpose of conveying the full and complete meaning of the first statement. Neither concept, however, applies here.
In dealing with the first theory, the primary question is whether the two declarations are "essentially a single, integral statement." State v. Gomez, 246 N.J.Super. 209, 218, 587 A.2d 272 (App.Div.1991) (quoting State v. Abrams, 72 N.J. 342, 343-45, 370 A.2d 852 (1977)) (Clifford, J., concurring and dissenting; Conford, J., dissenting). If they are, then the "trustworthiness ascribable to the [first] portion of the statement" which was against the *1037 declarant's interest, may also apply to the second portion even though, if considered in isolation, it would not be deemed contrary to the declarant's interest. As the court phrased the issue in Gomez, "In other words, the question is whether the trustworthiness ascribable to the portion of defendant's statement that was admitted..., is transferable to the portion in which he exonerated himself from criminal liability." Gomez, supra, 246 N.J.Super. at 219, 587 A.2d 272.
The trial court here rejected any such "tag along" rationale or claim that the trustworthiness of the first part of LaBranche's statement "rubbed off" on the second. The court found the two statements to be distinct and severable. It concluded that only the first was trustworthy and admissible because it was "inculpatory and against his [LaBranche's] penal interest, as it links him with the instrumentality of the crime." The second statement, the court held, did not contain those indicia of reliability:
[T]he remaining aspect of the statement, that he removed them [the nunchakus] for fears or concerns of the safety, those statements, ... do not tag along. They are self-serving and likely a product of contrivance on the part of Mr. LaBranche, which the Court has considered in the context of other statements he has made.
That reasoning is sound and compelling. We agree that the two statements are separate and distinct. The first was self-inculpatory and thus trustworthy. It was against defendant's interest to describe how he had obtained the weapon which he was charged with using in the subsequent murder. It is highly unlikely that he would have made such a statement had it not been true.
In contrast, it is easy to see why LaBranche would have made the second statement, even if it were not true. It offered what amounted to a defense or at least a mitigating factor. It said, in essence, that LaBranche did not take the weapon for a criminal purpose but rather for what amounted to a heroic gestureprotection of the women and children. The statement was not against his interest, but rather for his benefit. There is no indicia of trustworthiness in the statement, and no reason why the believability of the first statement should have "rubbed off" on the second.
Nor could the second statement be admitted on a theory of "completeness." In Gomez, the Court noted four bases on which an otherwise inadmissible statement could be accepted into evidence in order to provide "completeness" for another, admissible statement: (1) to explain the initial, admissible statement; (2) to provide a context for the admissible statement; (3) to avoid any misleading of the trier of fact; or (4) to insure "a fair and impartial understanding" of the initial statement. Id. at 220, 587 A.2d 272.
None of those reasons apply here. LaBranche's statement as to his altruistic motive for taking the nunchakus does not modify, explain or avoid misunderstanding of the essential point of his declaration against interest: that LaBranche had possession of the weapon used to kill Brandt. The subsequent explanatory and exculpatory statement was clearly separate and distinct. It did not bear on the truth or accuracy of the first statement, and cannot gain admission under any theory of completeness.
The determination of whether the exculpatory portion of a statement should be permitted to "tag along" with the inculpatory part, under the doctrine of continuing trustworthiness or for reasons of completeness is "peculiarly one for the discretionary judgment of the trial judge in the light of all the attendant circumstances." Abrams, supra, 72 N.J. at 345, 370 A.2d 852 (Conford, J., dissenting). We are satisfied that the trial court's decision to reject admission of LaBranche's second statement was correct and provides no basis for reversal.
*1038 III
In arguing that the court should have set aside the verdict and found her not guilty, defendant asserts that the only testimony which directly implicated her in Brandt's death came from Julie Hurt. She claims that Hurt's testimony was not credible, that there was no basis for a jury to conclude that LaBranche had acted at the solicitation of defendant, and thus a judgment of acquittal was required. We find defendant's characterization of the evidence unrealistic.
The applicable standard is set out in State v. Kluber, 130 N.J.Super. 336, 341-41, 327 A.2d 232 (App.Div.1974), certif. denied, 67 N.J. 72, 335 A.2d 25 (1975) (citation omitted):
The standard to be applied by the trial judge in deciding a motion for an acquittal under R. 3:18-2 is the same as that which applies when a motion for acquittal is made at the close of the State's case or at the end of the entire case. The trial judge must decide whether the evidence is sufficient to warrant a conviction. More specifically, the trial judge must determine whether the evidence, viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt. On such a motion the trial judge is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.
In applying that standard here, the trial court found the evidence more than sufficient to sustain a guilty verdict:
[I]t's clear from the evidence that this defendant orchestrated the entire series of events, an orchestration that began before the day of this particular incident that proceeded in the days before and up until this very day in question, that she was an individual who had control of and brought into her custody the weapon that was used in this murderous assault, that she instigated the entire circumstances of the evening that escalated and continued to escalate. Even when the tenor of them dissipated a little bit she energized them again. I think this jury saw exactly what happened here, and the court could see it from the evidence that she wanted Michael Brandt out of that house. She wished him to go on his way. She used the defendant who will be doing thirty years in jail as a foil and as her conspirator in effect to accomplish that end, and it was an end that she knowingly and purposely sought to have occur.
We find that reasoning and those conclusions clear and persuasive. That Julie Hurt was the prime witness against defendant does not undercut the State's case. Clearly, the jurors had every right to accept Hurt's testimony, and it would seem they did precisely that. While plaintiff is correct that Hurt changed some portions of her testimony between her initial statements to the Grand Jury and her trial testimony, she explained those variations. The question of whether to accept or reject her recitation, including the explanation of any inconsistencies, was obviously an issue for the jury. There was nothing inherently non-credible in her testimony and no reason why it could not be fully accepted by the trier of fact.
The testimony concerning defendant's possession of the nunchakus prior to the crime also implicated defendant in Brandt's death. In addition, her numerous requests to LaBranche to "beat up" Brandt were obviously significant. Indeed, but for those solicitations and defendant's orchestrated campaign against Brandt, it is difficult to conceive of any reason for LaBranche doing what he did. Defendant made clear her determination to have Brandt out of the house. She orchestrated the game in which Brandt drank too much. The man who killed him *1039 did so with a weapon she had obtained and retained, and which had been in her bureau drawer. The jury could well have found that LaBranche did what he did only because defendant induced him to do so. The verdict was amply supported by the evidence and the court's rejection of the motion to set aside the verdict was entirely proper.
IV
There is no merit to defendant's claim that her sentence to ten years imprisonment, the maximum term for a second degree offense, was excessive. The sentencing court was careful and conscientious in examining and weighing all applicable mitigating and aggravating factors. There was nothing in the sentence which shocks the conscience of this court and no reason for us to substitute our judgment for that of the trial court. See State v. Gardner, 113 N.J. 510, 516, 551 A.2d 981 (1989); State v. Roth, 95 N.J. 334, 362-65, 471 A.2d 370 (1984).
The trial judge found aggravating factors in defendant's having planned the drinking game and "targeted the victim," and her conspiring with LaBranche to beat up the victim. He found that her prior record constituted an aggravating factor, as did her determination to use "alcohol as a means of humiliation and/or making the victim more vulnerable."
The judge found few mitigating factors and rejected defendant's arguments in that regard. He noted that while defendant's prior offenses may have been minor in nature, they were "ongoing and continual." He also rejected the argument that her conduct was unlikely to recur, noting her "propensities to engage in acts of domestic violence." He noted that the defendant had shown "not one expression or one iota of remorse or anguish for this victim's death which is, indeed, remarkable when in the wake of that statement, she refers to herself and the victim as `friends.'" The court's conclusion was that, overall the court is of the opinion that these factors are substantially aggravated. Miss DeRoxtro, the malice directed toward Mr. Brandt, you solicited injury from him, the game you schemed to intoxicate and humiliate him needless to say took its most ugly turn. You stand here today with no remorse, and this court is of the opinion, balancing every factor as it has and the fact that the aggravating factors substantially outweigh the mitigating factors, this court will sentence you to the maximum term of ten years in New Jersey State Prison.
In State v. Gardner, supra, 113 N.J. at 516, 551 A.2d 981, the Supreme Court noted that when "conscientious trial judges exercise discretion in accordance with the principles set forth in the code and [relevant case law], they need fear no second-guessing." The trial court here was indeed conscientious and performed its duty carefully and painstakingly. There is no reason for second-guessing. The sentence, as well as the conviction, is affirmed essentially for the reasons stated in the various well considered and sound determinations made by Judge Grasso.
Affirmed.
NOTES
[1] The indictment also charged Neil LaBranche with the murder of Michael Brandt and included two additional counts against LaBranche, one for possession of a weapon for an unlawful purpose under N.J.S.A. 2C:39-4(d) and the other for resisting arrest contrary to N.J.S.A. 2C:29-2a. LaBranche was tried with DeRoxtro and was convicted of murder, of the weapons possession charge (which was merged into the murder conviction) and of resisting arrest. His appeal was submitted on the same day as this appeal and is being decided this day.
[2] Apparently, Brandt and DeRoxtro constituted one couple and LaBranche and Hurt another. LaBranche and Hurt, together with Hurt's baby, had moved in about two weeks before the murder. A nine-year-old girl, Kelly Lewis, had also been there for a "couple of days" although her relationship to the others is not clear from the record.
[3] Nunchakus are said to be a weapon consisting of two pieces of wood with a connecting metal chain. At trial, a neighborhood child testified that he had brought the nunchakus to defendant's apartment some weeks earlier and left them there. He said he had returned twice to recover the nunchakus, but defendant had put him off both times. The child's mother, and Julie Hurt as well, testified that the mother had come to the apartment on April 17 to recover the nunchakus, but defendant told her they had been packed away and she had no time to look for them.