45 A.3d 360

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. THOMAS NEVIUS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted May 7, 2012—Decided June 18, 2012.

Before Judges PARRILLO, GRALL and SKILLMAN.

*Joseph Krakora,* Public Defender, attorney for appellant (*James K. Smith, Jr.,* Assistant Deputy Public Defender, of counsel and on the briefs).

*Jennifer Webb–McRae,* Cumberland County Prosecutor, attorney for respondent (*Matthew M. Bingham,* Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

Tried by a jury, defendant Thomas Nevius, who represented himself at trial, was convicted of first-degree purposeful or knowing murder, *N.J.S.A.* 2C:11–3a(1) and (2)[1]; felony murder, *N.J.S.A.* 2C:11–3a(3); second-degree burglary, *N.J.S.A.* 2C:18–2; and third-degree conspiracy to commit burglary, *N.J.S.A.* 2C:18–2 and *N.J.S.A.* 2C:5–2.[2] He was sentenced to an aggregate of sixty-five years in prison, subject to the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2, requirement of 55 years, three months and one day before parole eligibility. Defendant appeals, and we affirm.

According to the State's proofs, Ruth Walker, the homicide victim, was a fifty-two-year-old woman living alone in a one-bedroom apartment at the Chestnut Square Apartment complex in Vineland. On Tuesday, July 30, 2002, her daughter Janira Walker–Castro, who was visiting from Florida, and her extended family spent the day in Wildwood. Ruth, however, stayed home because she was tired.

At 8:19 p.m., Janira called her mother on the cell phone she left with her, letting her know when the family would arrive for a dinner that Ruth planned to cook. Surveillance video at the Chestnut Square Apartment complex showed Ruth pulling into

---

[1] Defendant was originally indicted for capital murder; however, the State withdrew the aggravating factors, which declassified the case from a capital case.

[2] Defendant was found not guilty of third-degree possession of a knife with the purpose to use it unlawfully, *N.J.S.A.* 2C:39–4(d), and conspiracy to commit murder, *N.J.S.A.* 2C:11–3a(1) and (2) and *N.J.S.A.* 2C:5–2.

her parking space at 8:22 p.m., and exiting the van. When Janira phoned her mother again close to 10:00 p.m., there was no answer.

Later, the family arrived at Ruth's apartment and found it dark; the outside and inside doors were locked. No one had a key so Anthony Reyes, the victim's son, using a knife from his nearby home, eventually opened the outside door, and then easily gained entry to the inner door.

Janira's husband went into the bedroom and discovered the victim, who was clothed and wearing necklaces, lying on her back on the floor. She had no pulse. The bedroom was in disarray; the folding closet doors were on the floor, a table was broken, and the bedding was disheveled.

There was a blood-stained white, Fruit of the Loom T-shirt, size XXXL, on the bed, along with a bracelet. According to Janira, who was familiar with her mother's wardrobe, the victim did not wear or even own white Fruit of the Loom T-shirts. Police also found $391 in cash on top of the kitchen table, along with a cell phone and Ruth's keys. All of the windows were found to be locked and the sliding glass door secure; however, the rear kitchen screen had a small incision in it, but it was in a locked down position, and no entry could have been gained from it. There was a pot of water on the stove and meat defrosting in the sink, which led Vineland police officer Robert DeMarchi to surmise that as the victim started to prepare dinner, she heard a noise in the bedroom and took a knife with her to investigate.

Dr. Elliott Gross, the Cumberland County Medical Examiner at the time, performed an autopsy the next day. He determined that the victim, who was five-feet-six inches tall and weighed 225 pounds, was stabbed three times in the neck, with one of the stab wounds transecting the jugular vein and going through two of the vertebrae, which caused blood and air to reach the heart causing death. Due to the way the blood seeped down the victim's breasts, Gross believed the neck wounds were caused while she was standing.

Additionally, the victim's hyoid bone (in the neck) was fractured. That fracture, combined with petechiae in the victim's eyes, and necklace imprints around her neck, led Gross to conclude that the victim also had been strangled. Gross could not say for sure whether the strangulation had been done manually or with a ligature, but said both could have been used. Specifically, the T-shirt found on the bed could have been used as a ligature. Gross thought it likely that the person who strangled the victim was standing behind her because the marks did not extend all the way around her neck.

The injuries—the stab wound and the strangulation—occurred nearly concurrently, and each was capable in and of itself of causing her death. Gross believed that the victim's death was caused by more than one person because the two competing causes of death occurred nearly simultaneously and it would not have been likely that one person could have strangled her from behind and stabbed her from the front. In addition to the two fatal wounds, the victim had abrasions, bruises and cuts on her body that indicated she struggled with her attacker or attackers and tried to defend herself. Gross testified that a wooden-handled knife with a serrated edge, later recovered and identified as the victim's, could have caused the fatal stab wound.

Ian Hood, who was qualified as an expert in forensic pathology, reviewed Gross's autopsy report and photographs from the scene, and examined the recovered knife. He concurred with Gross's determination of the causes of death, that the knife presented was consistent with the stab wounds, that the T-shirt could have been used as a ligature, and that the victim was standing up and struggling when she was strangled from behind and stabbed from the front by two different people.

Police investigation quickly focused on William Boston, who lived next door to the victim. Their apartments shared a common outer door. In July 2002, Damien Stratton lived with Boston, Boston's mother, and Boston's step-father. He was "trying to get [him]self together" after having been in prison for convictions on

burglary and drug possession charges. Stratton knew defendant, and said that the day the victim was killed, defendant and Boston were together all day, and in the evening, they were "messing with" the screen in the victim's kitchen window; defendant had a knife and Boston had a box cutter. Stratton told Boston's step-father that the men were messing with the screen and at the step-father's insistence, Boston went inside. Boston went out again to rejoin defendant before Stratton left for the evening. Stratton admitted to having had "some drinks" that night.[3]

On the day of the homicide, from 1:15 p.m. to 4:30 p.m., Boston did "community service" in one of the apartments (37A) at the Parktown Apartments, helping the maintenance worker Jose Lopez clean the vacant roach-infested premises for re-renting. Earlier, on July 29, Lopez had applied boric acid powder to all of the surfaces in the apartment, including the kitchen cabinets, and found nothing on top of them. The next day, which was the day after the homicide, Boston worked from 3:00 p.m. until 5:00 p.m. No one had access to the apartment besides Lopez and Boston, and Boston did not have a key. A week later, Lopez reentered the apartment and found a wooden-handled knife with a six-to-eight-inch blade, sitting on top of a kitchen cabinet; it had no boric acid powder on it. Lopez turned the knife over to police, which Janira said looked "exactly like" the one used by her mother.

Boston was arrested on August 2, 2002, and charged with the homicide. At that point, Stratton, Beals, and Cesar Caban, a large friend of Boston's who could have fit the XXXL T-shirt, were suspects; defendant was not. At some later time, Stratton

---

[3] The day after the victim was killed, Vineland Police Detective Luis Negron spoke to defendant at the Parktown Apartments, which were next to the Chestnut Square Apartments, and where he had lived for about two years. Negron described defendant as "big" and "very muscular." Defendant admitted to having been at Boston's residence the day before, and recalled the victim giving Boston's mother mangoes earlier in the day. After leaving, defendant returned to Boston's apartment at about 9:00 p.m., with Tyrone Beals. However, defendant denied any knowledge of the homicide.

was eliminated as a suspect because his alibi was confirmed, and forensic tests on DNA found on the bloody T-shirt did not compare to Stratton's profile. Subsequently, it was also determined that the DNA on the T-shirt and a palm print did not match Boston's, Beals' or Caban's profiles.[4] However, police believed that Boston did not act alone due to his limited intelligence, and the fact that he was not a big person and would not fit an XXXL T-shirt.

On September 10, 2003, Vineland Police Detectives Shane Harris and Negron asked defendant to come to the station, and he complied. When they asked him to provide buccal swabs, defendant's body started to shake and his eyes watered. Defendant then said he felt like he was being set up, but he would provide the swabs because if he did not, it would seem like he was hiding something. Several weeks later, under court order, defendant provided a palm print impression. When confronted with the court order for the palm print, defendant got upset and said that he had never been in the victim's apartment.

Leslie Wanko, a supervisory forensic analyst for the FBI, conducted tests on the latent palm print found in the victim's bedroom, and determined with "100% certainty" that it matched defendant's palm print. Maureen Lo–Beer, an expert in toxicology, biochemistry and DNA analysis at the New Jersey State Police forensic laboratory, conducted DNA testing on the white XXXL T-shirt and found that she "could not exclude" defendant as the contributor of the DNA material found on the white T-shirt. The profile she found could be expected to be found in 1 of 480 million African–Americans, one in 786 million Caucasians, and 1 in 1.46 billion Hispanics.

Defendant was arrested on October 10, 2003. He gave a taped statement to police in which he denied ever being in the victim's apartment. At the end of the statement, Detective John Berry of

---

4 The DNA analysis also excluded the victim's son, Reyes, as a contributor to the DNA on the T-shirt.

the Cumberland County Prosecutor's Office asked defendant how, if he was never in her apartment, did his DNA get in her apartment. Defendant went into a "tirade" and said he was not there, he should not have consented to the buccal swab sample and that the police planted the evidence.

Under authority of a search warrant, Detective Lieutenant James Parent of the Cumberland County Prosecutor's Office conducted a search of defendant's bedroom on October 10, 2003. One of the items found was an XXXL Fruit–of–the–Loom T-shirt, which Parent described as "like a muscle shirt with the sleeves cut off" and "sort of what was found at the crime scene." Other sizes and types of T-shirts were also found, but only the XXXL shirt had cut-off sleeves. Gina Mave, who knew defendant through her position as the rental manager at the Parktown Apartments where defendant had resided, said defendant often wore shirts with the sleeves cut off, as he was a weight lifter. When shown the shirt recovered from his apartment, Mave agreed that it was the type of shirt defendant frequently wore. Parent identified the shirt found in the victim's apartment and the shirt found in defendant's bedroom as both being white XXXL T-shirts with the sleeves cut off.

Stephanie Beine of Genetics Technologies, Inc., testified as an expert for the defense. Her laboratory used the same processes as the State Police laboratory to test DNA. Under instruction from defendant's previous attorney, Beine focused on three areas of the T-shirt that had blood stains. She did not perform any DNA analysis on the other biological fluid or "epithetical cells" that may have been present, despite seeing "areas of fluorescence on the garment that would indicate possible other biological fluids being present." Beine found bloodstains "A" and "C" to contain a mixture of DNA from two contributors, one male and one female, but the genetic material detected from the male contributor fell below the laboratory's reporting threshold, and thus, she was not able to "include or exclude" defendant as a contributor.

Defendant, who represented himself at trial, testified on his own behalf. He admitted to being at Boston's apartment on July 30, 2002, but denied having anything to do with the victim's death. When asked how his DNA was found in the victim's apartment, he stated, "[m]y DNA is not nowhere in nobody's apartment." He also stated: "[m]y [palm] print is nowhere inside nobody's apartment except for my own." Defendant maintained that he had a job, as did his fiancée at the time, so he did not need "to steal from nobody." He admitted wearing T-shirts with the sleeves cut off as he was a weightlifter, but claimed that some of the shirts in his bedroom belonged to his step-son. He did not know how a bloody T-shirt got into the victim's apartment. He believed the prosecutor "put . . . up" the laboratory witnesses to lie. Defendant declared his innocence and said he did not know who killed the victim.

On appeal, defendant, through counsel, raises the following arguments:

I. THE TRIAL COURT VIOLATED *N.J.R.E.* 803(c)(25) AND DEFENDANT'S DUE PROCESS RIGHT TO PRESENT A DEFENSE WHEN IT REFUSED TO ADMIT WILLIAM BOSTON'S STATEMENTS ADMITTING HIS OWN INVOLVEMENT IN THE CRIME AND NAMING TYRONE BEALS AS HIS ACCOMPLICE.

II. THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION WAS VIOLATED BY THE STATE'S USE OF HEARSAY TESTIMONY ABOUT HOW TYRONE BEALS, DAMIEN STRATTON, AND CESAR CAB[A]N HAD BEEN ELIMINATED AS SUSPECTS. (Not Raised Below).

A. The Prosecution Violated *Melendez–Diaz v. Massachusetts* By Presenting Testimony From A Laboratory Supervisor About The Results Of Tests Performed By Another Lab Employee.

B. The Defendant's Right To Confrontation Was Violated By Det. Negron's Testimony That As A Result Of Interviews [W]ith "Various Individuals," Damien Stratton And Cesar Cab[a]n Had Been Eliminated As Suspects.

III. DEFENDANT'S RIGHT TO BE PRESENT AT ALL STAGES OF HIS TRIAL WAS VIOLATED BY AN OFF–THE–RECORD COMMUNICATION BETWEEN THE JUDGE AND THE JURY FOREPERSON WHICH RESULTED IN THE FOREPERSON BEING REPLACED BY JUROR NO. 2. (Not Raised Below).

IV. BECAUSE THE STATE TRIED THE CASE ON THE THEORY THAT DEFENDANT AND BOSTON WERE ACCOMPLICES, AND BECAUSE THE EVIDENCE WAS UTTERLY UNCLEAR ABOUT WHICH ACTOR

HAD DONE WHAT, THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON ACCOMPLICE LIABILITY, WHICH WAS CLEARLY INDICATED BY THIS RECORD. (Not Raised Below).

V. THE DEFENDANT'S 65-YEAR SENTENCE IS DISPARATE WITH THE 55-YEAR SENTENCE IMPOSED ON HIS CO-DEFENDANT, AND SHOULD BE REDUCED.

In addition, defendant pro se, presents the following issue:

GIVEN THE CIRCUMSTANCES OF THE DEFENDANT'S CASE, HE HAS ESTABLISHED THE CONDITIONS FOR THE PERFORMANCE OF FORENSIC DNA TESTING [AS SET] FORTH IN *N.J.S.A.* 2A:84[A]-32a *ET SEQ.*, AND THEREFORE, IS ENTITLED TO SUCH TESTING AS A MATTER OF LAW.

I

Defendant argues the court violated *N.J.R.E.* 803(c)(25) and his due process right to present a defense by excluding Boston's statements to police admitting his own involvement in the crime and implicating someone else other than defendant. We disagree.

Some background is in order. According to proofs adduced at Boston's *Miranda*[5] hearing, when first questioned by Detective Steven O'Neill on August 1, 2002, two days after the homicide, Boston said that on the night of July 30, he was with two individuals and one of them, Tyrone Beals, went to the front of the victim's residence and broke into the apartment while he and the other unidentified individual remained in the back. When the victim unexpectedly returned home, she was confronted by Beals, who panicked, grabbed a big chef's knife from the kitchen, and stabbed her several times. Boston "might have taken the knife with him."

Later, when the questioning was turned over to Detectives Negron and Harris, Boston admitted entering the apartment after Beals jimmied opened the doors; that the victim returned home; and that he hid inside the bedroom closet while Beals struggled

---

[5] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

with, and then stabbed, the victim. According to Boston, Beals then wiped the knife with a T-shirt.

When O'Neill, who had re-entered the room, told Boston that he was going to be charged based on the information provided, Boston stated he would tell him more and that he "wasn't going to go down for all this." Boston continued to give more details, claiming that Beals was responsible for stabbing and strangling the victim, but that Beals "made" Boston wipe off the knife with the T-shirt.

In the written statement that followed, Boston claimed that the night before the crime, when he, Beals, and Stratton were behind the victim's apartment and saw that the victim's house was "pitch black[,]" Beals tried to get Boston "to break into the apartment, but [he] did not want to do it." Beals was "cutting the screen with a Swiss knife when the victim caught him in the window."

On Tuesday, the night the victim was killed, Beals told Boston that they were "going to hit this apartment." Boston refused to do so, but Beals said that if he got caught, he would tell the police that Boston was the one who had broken in. Beals used a screwdriver to open both doors. As Beals looked around "for something to steal[,]" he asked Boston to be the lookout. When, from the victim's bedroom window, Boston saw the victim drive up, he left the apartment; he greeted the victim and thanked her for mangoes she had given his family earlier in the day. Boston was outside at the back of the victim's apartment when he heard screaming. He went into his own kitchen and got a butter knife, then entered the victim's apartment in an attempt to ward off Beals. However, Beals gave him "a rib shot." The victim followed Beals into her bedroom, where Beals stabbed her in the neck and chest. Then Beals used his shirt to "gag" her. Boston took the shirt off her neck as she "laid on the floor." Beals used the shirt to wipe the knife. Beals "ran off with the knife" after telling Boston to take it, but Boston wanted "nothing to do with

it." He concluded his statement by saying, "I am not a murderer!" and "I did not want to break into the apartment!" [6]

During the trial, while cross-examining Detective Negron, defendant referred to Boston's "nine-page statement" and asked Negron, "isn't it true that Mr. Boston told you that Tyrone Beals killed Ms. Walker?" The prosecutor objected. The judge ruled that the statement was "hearsay" and instructed the jury to disregard the question.

At the conclusion of the State's case, defendant represented that Boston would not testify, and offered Boston's statement as "a statement against penal interest." At this point, the prosecutor noted that after Boston was in prison, he gave a written statement to another inmate, Barrick Wesley, in which he said that Boston told him that he and defendant had committed the crime. In fact, Wesley had testified in Boston's trial that Boston had told him that he intentionally changed the actors in his written narrative to the police, and that whatever he had said Beals had done, he had actually done, and whatever he said he had done, defendant had actually done.

Referring to all the statements, the judge said, "I don't know how one gets in and the others don't. . . ." Defendant responded, "if the other statement has to come in then so be it. I won't argue with that just as long [as] the first initial statement gets in that he made to police that got him charged. . . ." The prosecutor argued that the written statement to Detective O'Neill was not against Boston's penal interest, and therefore should not be admitted, but if it was admitted, all of the statements, including the one implicating defendant, had to be admitted. The judge reiterated that if the statement to O'Neill was admitted, the statement to Wesley would be admitted as well. Defendant refused to withdraw his request to admit the statement, and said again that if both statements were admitted, "so be it."

---

[6] Boston's statements were admitted against him in his own trial.

The judge found that the statement to O'Neill was hearsay, and that it did not matter whether Boston was available to testify. He found that while the statement contained "a certain level of prejudice against the interest of Mr. Boston, the declarant[,]" nevertheless,

this was a homicide investigation. He, at best, makes himself in that statement, an unwilling and reluctant participant in a burglary, in which Tyrone Beals committed a homicide, if one were to believe the statement.

This statement is made to exculpate him from the greater of the offenses, that which was probably at one time, a capital murder charge. There can be no greater penal interest in the Court's mind. So, it lacks a certain reliability that would normally be associated with a statement against penal interest. It isn't in there that he said, "We murdered her." It's in there that Tyrone Beals did it. It ... seeks to place the blame on a third party that is not the declarant, that is the more heinous crime. And to believe that Tyrone Beals, for this Court to be able to find that Tyrone Beals had a—you get a street sense of accomplice liability that may—or felony murder, or any other legal theory that would subject him to the—that would subject him to penal consequences of homicide, which is the greater issue here, is—would stretch the imagination.

The judge concluded that Boston's statement to O'Neill had "little, if any, probative value" and that it would be "absolutely unfair and inappropriate to allow its admission into evidence" without allowing the statement to Wesley, which he found to be inadmissible. The judge then noted that the statement would be beneficial to defendant because it would allow him to argue to the jury that Boston gave a statement to police saying that someone besides him was involved in the crime, but it would be unfair to the State to allow Boston's statement to O'Neill without admitting his statement to Wesley.

At issue on appeal then is: (1) whether Boston's hearsay statements were inculpatory of the declarant in the sense of so far exposing him to criminal liability that but for their truth, the declarations would not have been made; and (2) whether that part of the statement claimed to be exculpatory of defendant is so inextricably related as to permit it to tag along with the inculpatory part under *N.J.R.E.* 803(c)(25). These are questions addressed in the first instance to the trial court's sound discretion. *State v. White*, 158 *N.J.* 230, 240, 729 *A.2d* 31 (1999); *State v. Abrams*, 72

*N.J.* 342, 343, 370 *A.*2d 852 (1977) (Clifford, J., concurring and dissenting); *Id.* at 344–45, 370 *A.*2d 852 (Conford, P.J.A.D., concurring and dissenting); *see also In re Hanges v. Metro. Prop. & Cas. Ins. Co.,* 202 *N.J.* 369, 997 *A.*2d 954 (2010). *See generally N.J.R.E.* 403; *Benevenga v. Digregorio,* 325 *N.J.Super.* 27, 32, 737 *A.*2d 696 (App.Div.1999), *certif. denied,* 163 *N.J.* 79, 747 *A.*2d 287 (2000).

So measured, the trial judge's conclusion that Boston's statements, viewed in their entirety, were not plausibly inculpatory as to warrant admission into evidence represents an unexceptionable exercise of his discretion. Therefore, we need not take the extra step to determine whether the so-called exculpatory portion is so intrinsically linked or associated therewith. But even if Boston's declarations were determined to be self-incriminating, we find his criminal liability did not depend on the identification of his confederate, so that the part supposedly exonerating defendant neither strengthened nor bolstered Boston's penal exposure.

Statements made out of court which are offered to prove the truth of the matter asserted are hearsay. *N.J.R.E.* 801. Hearsay evidence is not admissible at trial because it is considered untrustworthy and unreliable. *N.J.R.E.* 802. However, some exceptions to the hearsay rule have been made on the basis that "the circumstances under which the statements were made provide strong indicia of reliability." *State v. Phelps,* 96 *N.J.* 500, 508, 476 *A.*2d 1199 (1984). One such exception is made for a declaration or statement against interest under *N.J.R.E.* 803(c)(25):

> A statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true. Such a statement is admissible against an accused in a criminal action only if the accused was the declarant.

"The statement-against-interest exception is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably." *White, supra,* 158 *N.J.* at 238, 729 *A.*2d 31. "Consequently,

statements that so disserve the declarant are deemed inherently trustworthy and reliable." *Ibid.*

■■■ "The appropriate test for admissibility is whether, in the context of the whole statement, the particular remark was plausibly against the declarant's penal interest, even though it might be neutral or even self-serving if considered alone." *State v. Abrams*, 140 *N.J.Super.* 232, 236, 356 *A.*2d 26 (App.Div.1976), *aff'd o.b.*, 72 *N.J.* 342, 370 *A.*2d 852 (1977). The statement, however, must on the whole be so far against the declarant's interest that a reasonable person in the declarant's position would not have made the statement unless he believed it to have been true. *White, supra,* 158 *N.J.* at 238, 729 *A.*2d 31. It is, after all, the "statement's self-incriminatory character which renders a declaration against interest." *Id.* at 240, 729 *A.*2d 31.

Although defendant only moved to admit Boston's written statement to Detective O'Neill, neither that statement nor his earlier oral statements to the officers is truly self-inculpatory as to the declarant. On the contrary, these statements, considered either individually or collectively, are inherently self-serving and obviously tainted by the motive to exculpate the declarant from liability for the capital murder charge he was possibly facing. Indeed, the entire gist of Boston's accounts was that he a reluctant, hapless, if not coerced, participant in the initial plan to burglarize the victim's apartment, who quickly withdrew from the conspiracy and abandoned the plot. According to Boston, he returned, only in an attempt to disarm and physically remove Beals but, despite his best efforts, could not prevent the victim's homicide. In fact, Boston not only minimized, if not totally diluted, his responsibility for the burglary, but repeatedly denied either stabbing or strangling the victim and insisted that he even refused to take the knife from Beals when they left the apartment.

Taken as a whole, Boston's self-serving statements made after the victim's homicide and shifting blame to another provide "too much opportunity for contrivance to warrant admission." *State v. Gomez*, 246 *N.J.Super.* 209, 215–16, 587 *A.*2d 272 (App.Div.1991).

Under the circumstances, we cannot conclude that the trial judge's finding them too unreliable and untrustworthy to qualify as declarations against interest under *N.J.R.E.* 803(c)(25) and therefore inadmissible was an abuse of his sound discretion.

■ But even assuming some inculpatory thrust to Boston's statements, those portions that defendant alleges exculpate him from criminal liability are not necessarily admissible as a matter of course. Oftentimes, a statement offered under *N.J.R.E.* 803(c)(25) "contains material both adverse and favorable to the declarant." Biunno, Weissbard & Zegas, *Current N.J. Rules of Evidence,* comment 2 on *N.J.R.E.* 803(c)(25) (2011); *see also* 5 *Wigmore on Evidence* § 1477 (Chadbourn rev. 1974). When the declarant is the defendant himself, courts have routinely precluded self-serving portions of statements made after the commission of the crime. *See, e.g., State v. DeRoxtro,* 327 *N.J.Super.* 212, 221–24, 742 *A.*2d 1031 (App.Div.2000); *Gomez, supra,* 246 *N.J.Super.* at 216–17, 587 *A.*2d 272. And, as already noted, where the declarant is someone other than the defendant and the·other portions of the statement do not expose the declarant to criminal liability, then the exculpatory aspects of the declarant's statement will also be inadmissible. *State v. Brown,* 170 *N.J.* 138, 151, 784 *A.*2d 1244 (2001).

■ The issue arises, however, where the criminal defendant seeks to introduce a declarant's inculpatory statement that, in addition, contains material exculpatory to the defendant. Of course, the exculpatory material may not, on its face and when viewed strictly, be against the declarant's interest. Nevertheless, the entire statement may be admissible "if the exculpatory portions strengthen the incriminating effect of the inculpatory portions." Biunno, *supra,* comment. 6 on *N.J.R.E.* 803(c)(25). In other words, it is not necessary that "each discrete part of the statement ... imply involvement in a crime." *State v. Bell,* 249 *N.J.Super.* 506, 511, 592 *A.*2d 657 (Law Div.1991). Rather, the appropriate test is whether statements that exculpate the defendant "are sufficiently related to other statements that incriminate the declarant so that the defendant-exculpatory statements may

also be viewed as self-inculpatory statements of the declarant, thereby rendering them reliable." *White, supra,* 158 *N.J.* at 240, 729 *A.*2d 31. As the Court in *White* held:

> In sum, we hold that a declarant's statements exculpating a defendant should be admitted as evidence under the statement-against-interest exception to the hearsay rule if, when considered in the light of surrounding circumstances, they subject the declarant to criminal liability or if, as a related part of a self-inculpatory statement, they strengthen or bolster the incriminatory effect of the declarant's exposure to criminal liability.
> [*Id.* at 244, 729 *A.*2d 31.]

█ Whether such a declaration takes on an inculpatory character is, of course, fact-sensitive and must be considered in the context of the entire statement or series of statements sought to be admitted. Clearly, where the crime in question was known to have been committed by a single person, a confession by a person other than the defendant, clearly an inculpatory statement, would have a strong tendency to exculpate the defendant and would, therefore, be admissible. *See Abrams, supra,* 140 *N.J.Super.* at 236, 356 *A.*2d 26; *see also State v. Koedatich,* 112 *N.J.* 225, 311, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). Conversely, such a confession might be less conclusive if the crime was committed by more than one person. *State v. Allen,* 139 *N.J.Super.* 285, 287–88, 353 *A.*2d 546 (App.Div. 1976). But even then, the statement may be admissible. For instance, in *White, supra,* the Court held that statements by the declarant that he and another person had robbed the victim and then bragged about it to the defendant simultaneously inculpated the declarant and supported the inference that the defendant was not involved; therefore the exculpatory portion of the statement was not extricable or marginal and had the effect of strengthening the incriminatory effect of the inculpatory portion. 158 *N.J.* at 244–46, 729 *A.*2d 31.

Here, in contrast, the portions of Boston's statements that implicate Beals in the criminal episode do not necessarily exonerate defendant of any wrongdoing. But even if they may be said to have such an exculpatory effect inferentially, those aspects of Boston's statements are not sufficiently linked or related to the

self-inculpatory portions as to render them reliable by association. On the contrary, they are marginal and extricable because Boston's criminal culpability does not depend on the particular identity of his confederate or confederates and therefore the accusatory features of Boston's declarations do not strengthen the criminal effect of his admissions, or increase his exposure to criminal prosecution. If anything, the accusatory shifting of blame to Beals served to exculpate not only defendant but Boston as well and it is for this very reason that Boston's statements are inherently untrustworthy and therefore inadmissible under *N.J.R.E.* 803(c)(25).

■ For these very same reasons, defendant was not deprived of his due process right to present a defense by exclusion of the challenged material. While a defendant has a Sixth Amendment right to offer evidence that refutes guilt or bolsters his claim of innocence, *Chambers v. Mississippi,* 410 *U.S.* 284, 302, 93 *S.Ct.* 1038, 1049, 35 *L.Ed.*2d 297, 312–13 (1973); *State v. Harris,* 156 *N.J.* 122, 177, 716 *A.*2d 458 (1998), *cert. denied sub nom.,* 532 *U.S.* 1057, 121 *S.Ct.* 2204, 149 *L.Ed.*2d 1034 (2001); *State v. Jamison,* 64 *N.J.* 363, 378–79, 316 *A.*2d 439 (1974), that evidence must be competent, relevant and not unduly prejudicial. *State v. Garfole,* 76 *N.J.* 445, 452–53, 388 *A.*2d 587 (1978). As noted, Boston's out-of-court accusation against Beals is self-serving hearsay having little or no relevance to the issue of a third party's guilt. The trial court properly barred these statements under *N.J.R.E.* 803(c)(25) and such exclusion did not deprive defendant of a fair trial.

[At the direction of the court, per *R.* 1:36–2(a), the discussion of other issues in this appeal has been omitted from the published version of the opinion].

Affirmed.