# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1227-19

STATE OF NEW JERSEY IN
THE INTEREST OF L.B.,
a Juvenile.

_____

Argued February 23, 2021 – Decided March 29, 2021

Before Judges Yannotti, Mawla, and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FJ-20-0541-18.

Candace Caruthers, Assistant Deputy Public Defender, argued the cause for appellant L.B. (Joseph E. Krakora, Public Defender, attorney; Candace Caruthers, of counsel and on the briefs).

Milton S. Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent State of New Jersey (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Milton S. Leibowitz, of counsel and on the brief).

PER CURIAM

L.B. appeals from a January 16, 2019 adjudication on offenses, which if committed by an adult, would constitute second-degree unlawful possession of

a firearm, N.J.S.A. 2C:39-5(b)(1) (count one); fourth-degree possession of hollow point bullets, N.J.S.A. 2C:39-3(f) (count two); second-degree possession of a firearm while possessing a controlled dangerous substance (CDS) with intent to distribute, N.J.S.A. 2C:39-4.1(a) (count three); third-degree possession of a CDS and possession with intent to distribute, N.J.S.A. 2C:35-10(a)(1) (counts six and seven); third-degree possession of a CDS and possession of a CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) (counts eight and nine); two counts second-degree possession of CDS with intent to distribute within 500 feet of a public park, N.J.S.A. 2C:35:7.1(a) (counts ten and eleven); two counts third-degree possession of CDS with intent to distribute within 1000 feet of a school, N.J.S.A. 2C:35-7(a) (counts twelve and fourteen); third-degree possession with intent to distribute a prescription legend drug, N.J.S.A. 2C:35-10.5 (count fifteen); third-degree possession with intent to distribute an imitation CDS, N.J.S.A. 2C:35-11(a)(3) (count sixteen); and disorderly persons offenses of obstruction, N.J.S.A. 2C:29-1(a) (count four); and possession of a CDS (marijuana), N.J.S.A. 2C:35-10(a)(4) (count thirteen). We affirm in part, vacate in part, and reverse and remand in part.

The trial in this matter was originally scheduled for June 2018. A month prior, the trial judge granted the State's motion to obtain a buccal swab from

2

L.B. and his co-defendant A.W. to test for DNA on a handgun found in a room where they were arrested. The State's DNA expert produced a report linking L.B. to the gun. As a result, defense counsel requested an adjournment of the trial in order to obtain a forensic expert to analyze the DNA. Defense counsel noted she "received a voluminous packet [the first day of trial] of . . . lab notes and some other information from the State" that she wished to review. A.W.'s counsel joined in the adjournment request, and the State did not object. The trial was adjourned to January 2019.

When the matter returned for trial, L.B.'s counsel addressed the trial judge before opening statements and stated:

> The [c]ourt's aware that in this case something that is going to come up [is] DNA results. That's the swabs taken of [L.B.] And . . . there were some DNA results that resulted from the testing that was done on the gun.
>
> I had wanted to get an expert in the case for a few reasons. One is that . . . it's always good to have one. And two, the software that was used in this case is STRmix.[1] It's my understanding that only recently did Union County start using this brand new software

---

[1] "STRmix™ is expert forensic software, developed by ESR and Forensic Science South Australia . . . , that can resolve previously unresolvable mixed DNA profiles. . . . STRmix™ software combines biological modelling and mathematical processes to achieve results not possible with traditional DNA interpretation methods." ESR, https://www.esr.cri.nz/our-services/products-and-tools/strmix (last visited Feb. 26, 2021).

3

program. In the past had there been a complex mixture, which is what is going to come up in this case, with a number of people, the contributors that were on that mixture, this case would have been thrown out prior to something like STRmix existing.

So for that reason I wanted to get an expert. I was in touch with my supervisors and I've been in touch with people in Trenton. And I was able to find someone named . . . Nate Adams, who works for Bio-forensics. And I had been in touch with him throughout the course of the call. However, he wasn't vendor compliant with our office. And because it was an S corporation, they had shareholders in [fifty] states. He was not able to become vendor compliant until the end of November, leaving him not enough time to prep this case and testify as a witness in this trial.

The [c]ourt has given me a lot of time. I understand that. It has been seven months since I indicated that I did need this expert. But given that the new software is being used and the fact that . . . this is kind of outside of my control because we've got a compliance issue, I wanted to put that on the record because I think it goes directly to my client's [Sixth] Amendment right to confrontation.

In response, the judge stated:

The [c]ourt understands in this matter that . . . part of the State's case rests on DNA evidence and expert testimony. That came to the [c]ourt's attention back in June of 2018. Motions were filed, buccal swabs were taken, DNA tests were performed. That information was turned over quite early at that time to the [d]efense.

4

The [d]efense has had seven months to obtain an expert. I understand the [d]efense's statements that this is a new test and they located one person. And the Public Defender's Office has to go through the procurement process. It's been seven months. It's more than ample time to acquire that.

. . . [T]he [c]ourt's dockets cannot be held up on defendants constantly coming up with ["]well we got another matter here, another matter here.["] Certainly . . . and I don't put this on the attorneys before me because it's not partially their problem. They work for the Public Defender's Office, which has to go through certain procedures.

But in any other case a private attorney and so forth, they would be given a little . . . amount of time to go and get that [expert] . . . . He'd need to pay him and bring him in or not. We don't leave an open-ended matter here when the trial was scheduled in this case, quite some time ago, back in September or so. And it was scheduled and the [d]efense was told to go get it fixed. If you need the expert, get him. I gave you plenty of time to do so. You do not have it at this time.

So the matter is going to proceed. I understand the [d]efense's argument, but . . . the need to get an expert is not an open-ended need that you have a[n] unlimited amount of time to do so. There has to be a finite time to do so. The [c]ourt has to proceed. Otherwise the . . . juveniles' rights to a speedy trial are also affected because they're sitting waiting, [A.W.] in particular has been sitting in detention for some months waiting for this matter to proceed.

The trial proceeded over the course of four days during which the State presented six witnesses, including fact witnesses and three expert witnesses. We take the following facts from the trial record.

On January 23, 2018, Officer Scott Pavonis, and Detectives Luis Garcia and Athanasios Mikros, responded to a rooming house in Elizabeth. The owner of the building had previously provided a key to the building to police to monitor its common areas, which police used to enter the building. Detective Garcia testified that as he entered the vestibule of the building, he saw "a person to the left by the window, . . . wearing all red with long dreads. Then [he] saw another gentleman next to him to his left. He . . . had a [m]ohawk haircut. . . . And there was another person closest to the staircase . . . [a]nd he had . . . a twisty hairstyle." The three individuals were later identified as Jaquil Ellison, A.W., and L.B.

After Detective Garcia entered the building he yelled "Elizabeth Police, Elizabeth Police," and L.B. looked at the officers, "placed . . . his right hand and secured a black object [on the] . . . right side of his waistband area . . . [a]nd . . . immediately took off up the stairs." Ellison and A.W. followed L.B. up the stairs. All three officers followed and "once [Ellison, A.W. and L.B.] got to the second floor landing[,] they went into room four." When Officer

Pavonis tried to open the door it was locked. Detective Garcia knocked the door down.

The officers entered and Detective Garcia "smelled a strong odor of raw marijuana in the room." The officers turned on the lights and saw three men and a woman who was renting the room, laying with their eyes closed. The officers handcuffed the room's occupants. As Detective Garcia searched L.B. he observed a nine-millimeter handgun in a nearby cubbyhole, which was later found to be loaded with six live rounds. Officers found baggies of cocaine on A.W., and heroin on Ellison. A search of the room yielded quinine, cocaine, and marijuana.

The State also called Sergeant Krsysztof Audinis as an expert in the field of forensic firearm identification and Detective Anthony Reimer as an expert in the field of narcotics and narcotics distribution. Sergeant Audinis testified the firearm was operable. Detective Reimer explained the differences between crack and powder cocaine; how they are ingested, packaged, and priced; and the use of quinine. He also explained why the drugs discovered were not for personal use and were meant for distribution.

Monica Ghannam testified on behalf of the State as a forensic DNA analysis expert. She utilized the STRmix computer program to analyze swabs

A-1227-19

from the gun's trigger, slide, frame, and magazine. She opined the STRmix results showed "it [was] approximately 107,000 times more likely that the DNA is a mixture of [L.B.'s] and three unknown individuals than a mixture of DNA from four unknown individuals."

The trial judge concluded the State had proven "all the charges alleged in this matter" beyond a reasonable doubt against L.B.[2] He found all of the State's witnesses "direct and credible." The judge made the following findings:

> The State has proved that [L.B.] was in the vestibule. When he saw the police officers, he placed his hand on a black object in his waistband. And in defiance of orders, ran upstairs. He was visible to the officers. Never took his hand off the object in his waistband. And he entered . . . Room [Four].
>
> When the police entered the room, he was on the floor pretending to be sleeping. By him was the cutout in the wall in which was a loaded nine millimeter handgun. . . . [T]he handgun was a black item, which the State has shown to be the black item in his waistband, by the testimony.
>
> DNA shows that [L.B.] is strongly found to be in possession of the weapon.
>
> . . . .

---

[2] A.W. was tried together with L.B. and was likewise adjudicated on all charges.

A-1227-19

. . . His DNA was on it and on the magazine.

He was also in the room with the codefendants who were each in possession of . . . various CDS's. Cocaine, heroin, marijuana, prescription alleging quinine, which was . . . on the person of the adult codefendant . . . and in the mattress.

The amount of CDS was identified as an amount which would not be . . . for personal use, but was . . . packaged and in amounts that was normally associated with distribution and sale. It was construed in the totality of the facts to be in his possession as a codefendant with the others in the enterprise of distribution.

As all parties were together in the vestibule and in the room, the drugs were easily within the reach – particularly, the ones in the mattress and on the . . . dresser . . . were easily within the reach of [L.B.].

The judge placed L.B. on probation for three years with eighteen months participation in the Juvenile Intensive Supervision Program followed by an additional eighteen months' probation.

L.B. raises the following points on appeal:

POINT I – THE TRIAL COURT IMPROPERLY REFUSED TO GRANT THE JUVENILE'S DNA EXPERT FURTHER TIME TO PREPARE FOR TRIAL, THEREBY DENYING THE JUVENILE OF HIS RIGHTS TO PRESENT WITNESSES IN HIS DEFENSE AND EFFECTIVELY CONFRONT THE WITNESSES AGAINST HIM.

A.    Reversal is Required Because the Juvenile's DNA Expert Was Necessary for Him to Present a Complete Defense and Effectively Challenge the State's Most Important Evidence.

    i.    The Trial Court Improperly Denied L.B.'s Expert Additional Time to Prepare for Trial.

    ii.    The Trial Court's Erroneous Decision Was Harmful Because the Expert Would Have Provided Favorable and Indispensable Testimony about the Novel Probabilistic Genotyping Software.

B.    Alternatively, this Court Should Remand for a <u>Frye</u> Hearing to Determine Whether the STRmix Software is Reliable.

POINT II – THE STATE'S DRUG EXPERT'S TESTIMONY VIOLATED THE HOLDINGS OF <u>STATE V. CAIN</u> AND <u>STATE V. SIMMS</u> BY OPINING DIRECTLY ON THE JUVENILE'S INTENT, WHICH WAS AN ULTIMATE ISSUE OF FACT SOLELY FOR THE FACT-FINDER, REQUIRING REVERSAL.  (Not Raised Below).

POINT III – THE MAXIMUM PROBATIONARY TERM OF THREE YEARS IMPOSED BY THE COURT WAS EXCESSIVE AND REMAND IS REQUIRED.

Our standard of review in juvenile delinquency bench trials "is narrow and is limited to the evaluation of whether the trial judge's findings are supported by substantial, credible evidence in the record as a whole." <u>State in</u>

the Int. of J.P.F., 368 N.J. Super. 24, 31 (App. Div. 2004). "Although we defer to the trial court's findings of fact, especially when credibility determinations are involved, we do not defer on questions of law." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 331 (App. Div. 2011) (citing N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88-89 (App. Div. 2006)).

## I.

Adjournment decisions due to the unavailability of an expert witness lie within the discretion of the trial court and will not be disturbed unless there is an abuse of discretion. Kosmowski v. Atlantic City Med. Ctr., 175 N.J. 568, 574 (2003). Whether there was an abuse of discretion depends on the amount of prejudice the aggrieved party suffered. State v. Smith, 66 N.J. Super. 465, 468 (App. Div. 1961); see also State v. Hayes, 205 N.J. 522, 537 (2011) (holding an appellate court will reverse for failure to grant an adjournment only if the trial court abused its discretion, causing a party a "manifest wrong or injury.").

If the aggrieved party is unable to fully present his case as a result of the denial of an adjournment, then his or her substantial rights were infringed. Pepe v. Urban, 11 N.J. Super. 385, 389 (App. Div. 1951). "No eagerness to expedite business, or to utilize fully the court's time, should be permitted to

11

interfere with [the court's] high duty of administering justice in the individual case." Id. at 389. Reversal is not warranted for a refusal to grant an adjournment "unless an injustice has been done." Nadel v. Bergamo, 160 N.J. Super. 213, 218 (App. Div. 1978).

Furthermore, "[b]oth the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee to the accused the right 'to have a compulsory process for obtaining witnesses in his favor.'" State v. Garcia, 195 N.J. 192, 201-02 (2008). Both "guarantee criminal defendants 'a meaningful opportunity to present a complete defense.'" State v. Garron, 177 N.J. 147, 168 (2003) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). "Indeed, the right of an accused to present witnesses in his own defense 'is a fundamental element of due process of law.'" Garcia, 195 N.J. at 202 (quoting Taylor v. Illinois, 484 U.S. 400, 409 (1988)); see also State v. Sanchez, 143 N.J. 273, 290 (1996) ("[F]ew rights are more fundamental than that of an accused to present witnesses in his own defense." (quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973))).

As we noted, the trial judge reasoned he could not grant a second adjournment because: there were speedy trial concerns; defense counsel was afforded seven months to obtain an expert; the court could not permit its

12

calendar to be delayed; and litigants represented by assigned counsel should be treated the same as those who have private counsel and required to have their experts ready for trial. These reasons are unpersuasive.

Although we appreciate the judge's desire to move cases in an expeditious manner, this usurped L.B.'s fundamental right to mount a defense, which could have changed the outcome. Furthermore, the speedy trial argument was primarily L.B.'s to make. We understand the Public Defender should not be treated differently than private counsel, however, as L.B.'s counsel explained the process for retaining an expert utilizing public funds is entirely dissimilar to a litigant who can afford to retain private defense counsel and an expert. See Vendor Contract Compliance Requirements, NEW JERSEY OFFICE OF THE PUBLIC DEFENDER (2019), https://www.nj.gov/defender/documents/Waiver%20VCC% 20Requirements%20%2003-19-2019.pdf (articulating a detailed six step process required by the Department of Treasury for qualification of vendors capable of conducting business with the Office of the Public Defender). The record lacks any evidence defense counsel was lackadaisical in her efforts to retain a forensic DNA expert who was vendor compliant.

For these reasons, we reverse the adjudications related to the gun charges. However, we reject L.B.'s argument a reversal of the gun charges warrants reversal of the drug charges. Ghannam's testimony pertained solely to the handgun. Neither the State's presentation nor the judge's findings correlated the DNA evidence to the drug charges.

## II.

For the first time on appeal, L.B. challenges Detective Reimer's expert testimony relating to the CDS distribution. Detective Reimer was qualified as an expert in the field of narcotics and narcotics distribution without objection. He testified the drug amounts seized and the lack of paraphernalia in the room where police discovered the drugs signified the drugs were not for personal use, but instead for distribution. He also stated the presence of more than one type of drug, namely, heroin and cocaine, also signified a distribution operation and L.B. and his co-defendants were operating "like a convenience store" offering "something for everybody" to "increase[] . . . the amount of profits they could potentially gain."

N.J.R.E. 702 states "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

A-1227-19

experience, training, or education may testify thereto in the form of an opinion or otherwise."  To satisfy N.J.R.E. 702,

> the proponent of expert evidence must establish . . . (1) the subject matter of the testimony must be "beyond the ken of the average juror"; (2) the field of inquiry "must be at a state of the art such that an expert's testimony could be sufficiently reliable"; and (3) "the witness must have sufficient expertise to offer the" testimony.
>
> [State v. J.L.G., 234 N.J. 265, 280 (2018) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)).]

An expert witness may not opine on a defendant's state of mind because whether a defendant possessed a CDS with the intent to distribute is an ultimate issue of fact.  State v. Cain, 224 N.J. 410, 427 (2016).  In State v. Odom, the State presented a police detective as an expert witness who testified the defendant was in possession of a bag containing eighteen vials of crack cocaine with the intent to distribute.  116 N.J. 65, 68 (1989).  Our Supreme Court upheld the drug distribution conviction, holding "as long as the expert does not express his opinion of defendant's guilt but simply characterizes defendant's conduct based on the facts in evidence in light of his specialized knowledge, the opinion is not objectionable even though it embraces ultimate issues that the jury must decide."  Id. at 79.

Detective Reimer's testimony was detailed and grounded in his experience of having conducted over 100 narcotics arrests as a member of a narcotics strike force "assigned daily to engage in investigations [involving] narcotics related crimes, [such as] dealing, distribution, street level sales, mid-level sales and upper level sales." The purpose of his testimony was to inform the court why the amount and types of the drugs discovered in the room and the absence of paraphernalia evidenced distribution rather than personal consumption of CDS. Although this testimony may have embraced the ultimate issue the judge was to decide, it was not an opinion of L.B.'s guilt.

III.

Finally, we do not reach the disposition-related arguments raised by L.B. as his final disposition must abide the outcome of the remanded gun charges. However, the parties agree the adjudication under N.J.S.A. 2C:35-10(a)(4) must be vacated as a result of the passage of A. 1897 (2021). Therefore, this aspect of the adjudication is vacated.

Affirmed in part, vacated in part, and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1227-19